[Nos. A129849, A130313. First Dist., Div. Two. Nov. 14, 2011.]

Estate of ROGER PRESTON KAMPEN, Deceased.
SAN FRANCISCO OPERA ASSOCIATION, Petitioner and Appellant, v.
CHANDLER FLICKINGER, as Executor, etc., Objector and Respondent.

[No. A129856. First Dist., Div. Two. Nov. 14, 2011.]

Estate of JAMES LAWRENCE ELLINGTON, Deceased.
SAN FRANCISCO OPERA ASSOCIATION, Petitioner and Appellant, v.
CHANDLER FLICKINGER, as Executor, etc., Objector and Respondent.

**COUNSEL**

Evans, Latham & Campisi and Charles Paul Wolff for Petitioner and Appellant.

Kato Feder & Suzuki, Bruce A. Feder, Rowena Cuevas Navia; Solan & Park and Kevin M. Solan for Objector and Respondent.

**OPINION**

**LAMBDEN, J.**—In 1996, Chandler Flickinger became the executor of the estate of Roger Preston Kampen and the estate of James Lawrence Ellington. Two bonds were issued and filed with the court by the Great American Insurance Company (the bonding company). Both Kampen and Ellington left the assets in their estates to the San Francisco Opera Association (the Opera

Association) as the contingent beneficiary. In 1996, the Opera Association knew it was the sole beneficiary of both estates.

In 1999, Flickinger obtained a final order for distribution in the Ellington estate. Flickinger did not take any further action for many years. In January 2009, the Opera Association filed separate petitions with regard to both estates to, among other things, surcharge Flickinger.

The probate court conducted a trial on the petitions in both estates. At the end of the trial, the court found that Flickinger breached his fiduciary duty. The court surcharged Flickinger for the loss of value to the estates caused by his unreasonable delay and also surcharged him the compensation he had received in 1999 related to the Ellington estate. The court, however, found that Flickinger had not used the funds or mingled them with his own funds and it, therefore, rejected many of the Opera Association's claims for damages and found that Flickinger's affirmative defense of laches barred any claims for damages not based on a statute. Evidence at trial established that bank accounts had previously been included in the Ellington estate that were actually part of the Kampen estate. The court amended the earlier final distribution order in the Ellington estate to reflect this reduction in the total cash.

The Opera Association appeals from three orders and claims that it was entitled to interest on the assets in both of the estates for the period of time that Flickinger failed to distribute the assets. The Opera Association also objects to the lower court's refusal to use alternative measurements of damages that the Opera Association proposed. Additionally, it challenges the lower court's application of Flickinger's defense of laches. Finally, the Opera Association asserts that the lower court did not have the authority to amend the original order of distribution in Ellington's estate. We are not persuaded by the Opera Association's arguments, and affirm the lower court's orders.

## BACKGROUND

*1996 to 1999*

On May 6, 1996, both Kampen and Ellington separately executed wills with similar provisions. Flickinger drafted both wills. Both wills had provisions that left the estate to the other if the other survived the testator by at least 90 days. Both men left their entire estate to the Opera Association if the other man did not survive the testator by 90 days. Each man designated the other as executor and nominated Flickinger as the alternate executor.

Sixteen days after executing his will, on May 22, 1996, Kampen died. Less than 90 days later, on June 10, 1996, Ellington died. Flickinger, represented

by his then law partner, R. Hollis Elliott, filed petitions for probate for the Kampen and Ellington estates in June and July 1996, respectively; Flickinger became the executor for both. The wills were admitted into probate and Flickinger was appointed executor of the estates. Two bonds were issued and filed with the court by the bonding company. Notices of both petitions were mailed to the Opera Association.

On June 25, 1996, Caroline Mason,[1] the associate director of planned gifts for the Opera Association, wrote a memorandum stating that Flickinger indicated that the Opera Association could expect "between $250,000 and $500,000 combined from the Kampen and Ellington estates." The memorandum stated that Flickinger opined that the Opera Association would receive "all the money within one year." Mason wrote that "[t]hese bequests combined would be ideal for a production co-sponsorship for 1997."

On December 13, 1996, Flickinger filed an inventory and appraisement reflecting that Kampen's estate had $131,242.59. On January 29, 1997, he filed an inventory and appraisement indicating that Ellington's estate had $293,491.17.

On May 22, 1998, Allison Groves, the successor to Mason, wrote an e-mail to another employee of the Opera Association regarding the Ellington and Kampen estates.[2] She stated she had contacted Flickinger and he indicated that he had "one sizable problem with each estate and as a result ha[d] no idea when everything [would] be settled."

On December 17, 1998, Flickinger filed a first and final account and report for Ellington's estate and a petition for its settlement. A copy of the notice of the hearing on the petition was mailed to the Opera Association on December 22, 1998.

On January 29, 1999, the probate court issued an order for "judgment settling first and final account and report of executor; allowing compensation for ordinary services; and for final distribution" (the 1999 order).[3] The 1999 order authorized Flickinger to pay Elliott, his attorney, $7,019.81. It authorized Flickinger to pay himself "$7,019.91 as statutory compensation for services rendered in administering the estate and $7,375.27 as the 10 percent of gross sales price of items sold by him in the estate as instructed in decedent's will." It further provided: "The estate in the possession of the administrator remaining for distribution shall be distributed to the beneficiary

---

[1] Mason was the associate director of planned gifts from January 1993 until September 1997.

[2] Groves was the associate director of planned gifts from May 1998 until December 1999.

[3] It is unclear whether the Opera Association received service in 1999 of the 1999 order.

of the estate as follows: The residue of cash in the estate's [accounts] to the San Francisco Opera Association, being cash of approximately $283,900.59 total." The court identified this money as being in accounts in Washington Mutual Bank, in individual retirement accounts (IRA's) with Great Western Bank, and in certificate of deposit (CD) accounts in California Federal Bank and Bay View Federal Bank.

On February 3, 1999, Flickinger paid Elliott his statutory fees and paid himself his statutory fees and commissions in the amounts set forth in the 1999 order. In 1999, Flickinger cashed out two of Ellington's CD accounts and deposited the proceeds into checking accounts belonging to Ellington's estate.

*2000 to 2008*

Between the 1999 order and his retirement in 2005, when he moved to San Diego, Flickinger did not contact the Opera Association regarding either Ellington's or Kampen's estate. The Opera Association believed one of its employees or agents contacted the attorney for Flickinger in 2002 to inquire about Ellington's estate. It also believed that it received a copy of the 1999 order in 2002.

In 2005, as part of a periodic review of open estate files, Stacy Cullison, the senior director of planned giving at the Opera Association, and another person at the Opera Association, identified the Ellington file. At first Cullison supposed that the Opera Association had received the bequest but the sum had not been entered into the electronic database "or the receipt had not been sent to development." In August 2006, the Opera Association hired Sam Leask, a planned giving manager. In 2007, the Opera Association investigated whether it had received the funds from Flickinger and determined that it had not received the money. The Opera Association then retained counsel.

Counsel for the Opera Association located Flickinger and contacted him in late October 2008. On January 5, 2009, Flickinger sent a check to the Opera Association from the Ellington estate for the amount of $248,879.59. He stated in the letter that this amount was "at least a start" and that he would be away for the rest of the month but would contact counsel for the Opera Association when he returned.

*The Petitions Filed by the Opera Association and the Accounts Filed by Flickinger*

On January 23, 2009, the Opera Association filed two petitions in the superior court regarding the Ellington estate and the Kampen estate. The Opera Association served the bonding company with both petitions.

With regard to the Ellington estate, the Opera Association asserted that Flickinger failed to comply with the 1999 order and had provided no explanation for his delay. In its prayer, the Opera Association requested that the court order Flickinger to distribute the remaining assets of the estate as set forth in the 1999 order, order Flickinger to provide an accounting, order a surcharge of Flickinger for the full value of all undistributed assets of the estate plus interest from the date of the 1999 order through the date of distribution of all assets, order Flickinger to reimburse the estate for all compensation previously received from the estate plus interest on those sums, and order exemplary damages against Flickinger under Probate Code section 859.

Similarly, in the Opera Association's petition related to the estate of Kampen, the Opera Association sought an accounting and to surcharge Flickinger for his delay in administering the estate. The Opera Association requested exemplary damages against Flickinger under Probate Code section 859. The Opera Association also sought Flickinger's removal.

On March 24, 2009, the court held a hearing on both petitions. Counsel appeared for the Opera Association and the attorney for Great American Insurance Company appeared. Flickinger appeared in propria persona. With regard to Ellington's estate, Flickinger acknowledged that he still owed about $35,021 and explained: "The rest of it is in two IRAs . . . , and we're trying to locate those accounts now. . . . They may have escheated to the State. That's what happens because it was inactive for so long. But they would make up the balance of the money due. . . ."

The court asked Flickinger the reason for the delay from 1999 until January 2009. Flickinger replied: "Well, at the time, I don't—I am forgetting exactly when—I retired from the practice, and this is the one case I guess that was not closed up. And I moved down to San Diego County. And then I had all sorts of personal problems, health wise, and so forth, and I just didn't attend to it. And when I got the lawsuit, of course, it brought everything to my attention again. I mean, I knew I had to do it. But I just kept doing other things instead. So I don't know how long it's going to take me to get the money out of the State, if it has escheated to the State. But that's what's happened. I just had many other things on my plate at the time and they seemed to take priority."

On April 7, 2009, the court filed its order and instructed Flickinger to file a supplemental account of his acts from September 18, 1998. It also ordered him to file a status report on the IRA's in Ellington's estate. With regard to Kampen's estate, the court ordered an accounting.

On April 28, 2009, Flickinger filed a supplemental account in Ellington's estate. He filed a status report regarding the IRA's on May 4, 2009. He reported that he had incorrectly inventoried the IRA's as part of the Ellington estate. He stated that these accounts were actually part of Kampen's estate. He submitted an amended accounting.

Flickinger filed a supplemental account in the Kampen estate on July 21, 2009. This accounting added the IRA's.

In October 2009, Flickinger retained counsel. Subsequently, he filed amended accounts. Pursuant to a stipulation by the parties, the court ordered a preliminary distribution of $100,000 from Kampen's estate to the Opera Association.

*The Trial on the Petitions to Surcharge*

The Opera Association filed its trial brief on May 26, 2010. The Opera Association maintained that it was entitled to a surcharge against Flickinger because of his delay in complying with his fiduciary responsibilities. With regard to Ellington, the Opera Association urged the court to award it the rate of interest of 10 percent under Code of Civil Procedure section 685.010, subdivision (a), on the unsatisfied portion of the judgment. The Opera Association asserted that this statute applied under Probate Code section 1049. The Opera Association maintained that the court should impose a surcharge at a rate of 10 percent per year on the amounts undistributed from the Kampen estate under Probate Code section 9602, subdivision (a), or Civil Code section 3287, subdivision (a). Additionally, the Opera Association requested two alternative measurements of damages based on amounts it claimed it lost by not being able to invest the money in a timely fashion or based on the costs it incurred because it had to borrow funds.

The probate court held an evidentiary hearing on the Opera Association's surcharge petitions in both the Kampen and Ellington estates. Flickinger testified that he did not distribute the money because he could not balance the accounting in the Ellington estate and was preoccupied with medical issues. The judgment of distribution ordered him to distribute approximately $283,000 in the Ellington estate, and Flickinger testified that he did not do this because the checking account contained about $40,000 less than that amount. Since he could not balance the account, he did not give the Opera Association the money.

*The Court Orders*

On July 30, 2010, the court filed separate findings and orders in the estates of Ellington and Kampen. With regard to the petition for surcharge in the

estate of Ellington, the court noted that Flickinger had a duty to distribute promptly the money due to the Opera Association under the 1999 order. The court found that the statutes cited by the Opera Association in support of its claim of 10 percent interest on a money judgment did not apply because "[a] judgment or order of final distribution by a court sitting in probate jurisdiction is not a money judgment. Instead, it is an order that distributes a decedent's estate." Thus, it concluded that the Opera Association was not entitled to interest.

The court stated that although an order for final distribution was not a money judgment, the Opera Association had the right to bring an action against Flickinger for failing to distribute the estate. The court also considered Flickinger's affirmative defense of laches and found the evidence showed that the Opera Association knew Ellington's estate had not been distributed, but failed to take any formal action until January 2009. The court explained that the Opera Association "could have brought an action against Mr. Flickinger at any time before January 23, 2009, but failed to do so and slept on its rights despite having knowledge of the amount owing." The court ruled that laches barred the Opera Association's request to recover interest at the legal rate from the date of distribution.

The court also rejected the Opera Association's two alternative calculations of interest based on Flickinger's delay. It concluded that nothing in the Probate Code authorized an award of interest based on either of these calculations. Additionally, the court found both of these methods speculative and without support.

The court then proceeded to address a surcharge based on Flickinger's breaching his fiduciary duty under Probate Code section 9601. The court found that Flickinger breached his fiduciary duty by failing to distribute the Ellington estate in a timely fashion. The court found that Flickinger did not profit by the delay and that the estate did not lose a profit as a result of the breach of duty.

The court, however, found that Flickinger's breach of fiduciary duty did result in a loss of value to Ellington's estate under Probate Code section 9601, subdivision (a)(1), because the estate had to pay ongoing bond premiums. The court therefore surcharged for the bond premiums for a total of $5,641.01 and found Flickinger liable for interest at the rate of 10 percent.

The court also noted that it had authority under Probate Code section 12205 to reduce a personal representative's compensation for failure to administer an estate in a timely fashion. The court found that the time Flickinger "took for administration of the estate exceed[ed] the time required by the Probate

Code; the time taken was within the control of the personal representative whose compensation [was] being reduced; and the delay was not in the best interest of the estate or interested persons." The court surcharged Flickinger the statutory compensation for services rendered in administering the estate in the amount of $7,019.81 and for services related to the sale of estate property in the amount of $7,375.27. The court stated that the Probate Code did not provide for interest on this amount and these sums did not fall within the definition of Probate Code section 9601, subdivision (a)(1).

The court's order regarding the Kampen estate pointed out that Flickinger failed to administer the estate in a timely fashion but there was no order for final distribution. The court found that the Opera Association was not entitled to interest under Civil Code section 3287 and, even if it could seek interest under a different theory, laches barred any claim for interest because the Opera Association failed to assert its rights in a timely fashion. The court surcharged Flickinger for bond premiums for a total of $4,105 and ruled that the Opera Association was entitled to interest at the rate of 10 percent. The court stated that at the time of final distribution Flickinger would not be allowed any fees for administration of the estate.

The Opera Association had requested a surcharge on a number of payments made by Flickinger regarding the Kampen estate and the court denied them except for the payment of $5,000 in taxes. The court found that Flickinger did not submit evidence explaining this payment and surcharged him $5,000 plus interest at the legal rate from the date of payment.

With regard to both estates, the probate court denied the Opera Association's request for double damages under Probate Code section 859. The court ordered the preparation of a revised order on amended first and final report of executor and for final distribution.

*Orders for Final Distribution and Appeals*

On September 7, 2010, the court filed its order for final distribution under the will in the Kampen estate. It noted that $100,000 had been issued to the Opera Association on May 12, 2010, and the assets remaining in the Kampen estate as of August 23, 2010, was $69,007.35. The court denied Flickinger the statutory compensation for administering the estate of Kampen. The court ordered Flickinger, in his personal capacity, to pay $17,332.73, the surcharged amount, to the Opera Association. The money remaining in the estate, minus $6,753,49, which was to be paid to Flickinger's counsel, was to be paid to the Opera Association.

On this same date, September 7, 2010, the court filed its amended order for final distribution in the Ellington estate. The court amended the 1999 order to

reflect the correction in the assets in Ellington's estate, as supported by the accountings submitted by Flickinger. The 1999 order included two IRA's that Flickinger later determined were part of Kampen's estate, not Ellington's estate. The amended order stated that Flickinger's "distribution of cash totaling $248,879.59 to [the Opera Association] on January 8, 2009, said amount having been reduced by the IRA which instead should have been paid to the estate of Roger Kampen . . . represents the total sum to be distributed to [the Opera Association] by the executor from this estate." The court also ruled that Flickinger should personally pay the Opera Association $23,559.71, the total of all surcharged amounts pertaining to this estate.

On September 24, 2010, the Opera Association filed a notice of appeal in the Kampen estate from the order on its petition to surcharge and remove Flickinger and a notice of appeal in the Ellington estate from the order on its petition and the amended order. On October 21, 2010, the Opera Association filed its notice of appeal for the order for final distribution in the Kampen estate. On February 15, 2011, we granted the stipulated motion to consolidate the three appeals of the Opera Association. The Opera Association and Flickinger filed briefs in this court, and the bonding company filed a brief stating that it "adopts all of the Respondent's Brief filed in these consolidated appeals by respondent Chandler Flickinger."

## DISCUSSION

### I. *The Integrity of the Probate System*

The Opera Association maintains that Flickinger failed to carry out his fundamental duty as the personal representative of a probate case by not distributing the assets of the estates of Ellington or Kampen and therefore the lower court erred in refusing to impose statutory interest or to otherwise surcharge Flickinger for his delay. The Opera Association asserts that it is immaterial that Flickinger did not steal or borrow the funds. It argues, "If the decision of the court below is not reversed, there will be no consequence to the executor for failing to meet his basic fiduciary responsibilities." It maintains that the integrity of the probate system mandates reversal.

To support this argument, the Opera Association sets forth the basic principle that "the object of the probate and administration proceedings is to secure distribution to the persons entitled to share in the estate." (*O'Day v. Superior Court* (1941) 18 Cal.2d 540, 543 [116 P.2d 621].) "It will not be questioned that justice and sound policy require that the estates of decedents be distributed to persons rightfully entitled thereto and that every concern and endeavor of a probate court should be to the accomplishment of that purpose." (*Edlund v. Superior Court* (1930) 209 Cal. 690, 695 [289 P. 841].)

Here, the probate court did carry out its role of making sure that Flickinger distributed the assets in the estates of Kampen and Ellington once the Opera Association sought relief from the court. Contrary to the Opera Association's claim that reversal is required under a "global perspective" and that we need not consider the "particulars," the integrity of the probate system requires the probate court to follow the law. Thus, the integrity of the probate system would be undermined if we reversed the lower court even though it correctly interpreted and applied particular statutes.

We also disagree with the Opera Association's argument that unless we reverse, administrators will be free to ignore their responsibilities unless the beneficiary takes some action. The probate court required Flickinger to disgorge the compensation he had received pursuant to the 1999 order. It also required him to pay the cost of the bond premiums plus interest. The court surcharged Flickinger a total of $17,332.73 in the Kampen estate, and a total of $23,559.71 in the Ellington estate, for a combined total of $40,892.44. Given that Flickinger had to pay the loss in value to the estates caused by his negligence and that he received no compensation for his work, we disagree that an administrator will have no incentive to meet his or her fiduciary duties when administering an estate.

Furthermore, as the lower court pointed out, the Opera Association was not without any power to do anything. Despite knowing that it was the beneficiary and entitled to the assets in both of these estates, the Opera Association waited many years before demanding the money from Flickinger and filing petitions in the superior court. Thus, this is not a situation where the Opera Association is entirely without some responsibility for the delay.

## II. *The Rulings on the Requested Statutory Damages*

### A. *Standard of Review*

■ The Opera Association challenges the probate court's interpretation and application of various statutes. We review the interpretation and application of a statute to undisputed facts de novo. (*Groth Bros. Oldsmobile, Inc. v. Gallagher* (2002) 97 Cal.App.4th 60, 65 [118 Cal.Rptr.2d 405].) The rules of statutory interpretation provide that the court's " 'first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or

statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' " (*Steinfeld v. Foote-Goldman Proctologic Medical Group, Inc.* (1997) 60 Cal.App.4th 13, 17 [70 Cal.Rptr.2d 41].)

B.  *Code of Civil Procedure Section 680.270 Does Not Apply to the 1999 Order*

The probate court rejected the argument that pursuant to Code of Civil Procedure section 680.270 interest attached to the money in the Ellington estate was not timely distributed to the Opera Association under the 1999 order. The Opera Association contends that the 1999 order was a money judgment under Code of Civil Procedure section 680.270, and the court should have imposed interest at the rate of 10 percent under Code of Civil Procedure section 685.010, subdivision (a). (See Prob. Code, § 1049 ["An order may be enforced as provided in Title 9 (commencing with Section 680.010) of Part 2 of the Code of Civil Procedure."].) For the reasons discussed below, we agree with the lower court that Code of Civil Procedure section 680.270 does not apply.

The lower court rejected the Opera Association's request for interest under Code of Civil Procedure section 680.270, because it ruled that the 1999 order was not a money judgment. " 'Money judgment' " is statutorily defined in the Code of Civil Procedure as "that part of a judgment that requires the payment of money." (Code Civ. Proc., § 680.270.) A money judgment "must be stated with certainty and should specify the amount." (*Kittle v. Lang* (1951) 107 Cal.App.2d 604, 612 [237 P.2d 673].)

Here, the 1999 order provided: "The estate in the possession of the administrator remaining for distribution shall be distributed to the beneficiary of the estate as follows: The residue of cash in the estate's [accounts] to the San Francisco Opera Association, being cash of approximately $283,900.59 total." Thus, the order mandated the distribution of an inexact amount of cash. Since the sum in the 1999 order was not a fixed and ascertainable amount, it was not a money judgment order.

Furthermore, even if the 1999 order had set forth a specific sum to be distributed, it still would not have been a "money judgment." The final distribution order of the probate court may be construed as a "final judgment." (*Bacon v. Bacon* (1907) 150 Cal. 477, 486 [89 P. 317] [under predecessor statutes "the decree of distribution should have the same force and effect as other final judgments . . ."].) However, "[i]t is a 'final judgment'

settling the administrator's final account, approving the administrator's report, and distributing [the assets in the estate]." (*Mason v. Department of Real Estate* (2002) 102 Cal.App.4th 1349, 1354 [126 Cal.Rptr.2d 278].) It is not a judgment that "requires the payment of money." (Code Civ. Proc., § 680.270.) Rather, it is a judgment distributing assets.

A final order of distribution operates in rem to settle the testate and intestate rights to distribution of all those who either did or could have participated as claimants. (See Prob. Code, § 11705, subd. (b).) "This principle acts to preserve the finality and conclusiveness of such decrees and to guarantee the integrity and stability of the titles to the property embraced in the decrees." (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1531–1532 [37 Cal.Rptr.2d 810].) The Ellington estate only had cash, but other estates may have real property or tangible personal property. The distribution order settles all claims involving all the assets in the estate, and is clearly not a "money judgment" in favor of one particular party.

In its opening brief in this court, the Opera Association does not cite to any authority to support its interpretation of the statutes and simply asserts that the lower court erred in setting forth a "technical" distinction between a money judgment order and a final distribution order. It argues that it is immaterial that a distribution order may sometimes involve the distribution of real property because Code of Civil Procedure section 680.270 recognizes that another part of the same judgment might require the transfer of other types of property.

In its reply brief, the Opera Association refers to *In re Marriage of Farner* (1989) 216 Cal.App.3d 1370 [265 Cal.Rptr. 531] and *In re Marriage of Wilcox* (2004) 124 Cal.App.4th 492 [21 Cal.Rptr.3d 315] to argue that the 1999 order required payment of a sum of money and was therefore a money judgment. (*In re Marriage of Farner*, at p. 1376 [court rejected husband's claim that an earlier judgment granting the wife a percentage interest in her husband's pension benefits was not a money judgment]; *In re Marriage of Wilcox*, at p. 501 [court rejected husband's argument that a judgment directing him to pay money to his ex-wife was a form of property under the Family Code and not a money judgment].) Neither of these cases is a probate case; the orders in these family law cases did not involve distribution orders. Furthermore, in both of these cases, the former wife had a claim against the husband for funds. Here, the Opera Association has no claim for funds against Flickinger, personally. Rather, it has a claim that he breached his fiduciary duty for failing to distribute the cash in Ellington's estate as mandated by the 1999 order.

■ A proceeding for the distribution of an estate in probate is in the nature of a proceeding in rem. The distinction between a claim for money

damages and a claim that the person is "entitled to distribution of the decedent's estate" (Prob. Code, § 11700) is not a "technical" distinction. The assets of the estate are distributed or given to beneficiaries. The court does not make any determination regarding a claim of injury and does not set forth an exact amount of damages owed, which is a requirement for a money judgment. Furthermore, as already noted, the beneficiary does not have a claim for damages against the administrator. Rather, the beneficiary has a claim that the administrator breached his or her duty by failing to distribute the assets in the estate as mandated by the final distribution order. Accordingly, the lower court correctly ruled that the 1999 order of final distribution is not a money judgment.

## C. *Damages Under Probate Code Sections 9601 and 9602*

The probate court did assess damages under Probate Code section 9601, subdivision (a)(1). It found that Flickinger's breach of his fiduciary duty caused some loss of value to the estate and it surcharged Flickinger for the depreciation in the estate plus interest that was caused by his unreasonable delay. The Opera Association claims that it was entitled to interest on the full value of the assets in the estates under Probate Code section 9601, subdivision (a)(1). It argues that "[e]ach year that Flickinger sat on the funds, those funds were 'lost' to the estate and its beneficiary."

Probate Code section 9601 provides the following: "(a) If a personal representative breaches a fiduciary duty, the personal representative is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the decedent's estate resulting from the breach of duty, with interest. [¶] (2) Any profit made by the personal representative through the breach of duty, with interest. [¶] (3) Any profit that would have accrued to the decedent's estate if the loss of profit is the result of the breach of duty. [¶] (b) If the personal representative has acted reasonably and in good faith under the circumstances as known to the personal representative, the court, in its discretion, may excuse the personal representative in whole or in part from liability under subdivision (a) if it would be equitable to do so." Probate Code section 9602 establishes the amount of interest to be charged if the executor breaches his or her duty under Probate Code section 9601, subdivision (a)(1) or subdivision (a)(2).

Here, the undisputed evidence established that Flickinger did not profit from the delay. There also was no evidence that the estate lost any profit as a result of Flickinger's breach. The Opera Association is not entitled to interest it *could have* earned on the cash in the estates. An executor is similar to a trustee in many respects but, unlike a strict trustee, an executor has no statutory duty to invest money belonging to the estate. (*Estate of*

*McSweeney* (1954) 123 Cal.App.2d 787, 793 [268 P.2d 107].) The court in *Estate of McSweeney* concluded that the executors should not be compelled to pay simple interest on estate funds that had been maintained in a non-interest-bearing account for six years. (*Ibid.*) The executor's primary duty is "to preserve and protect the assets until distribution." (*Ibid.*)

Since Flickinger did not have a duty to place the cash in the estate in some type of account, the Opera Association cannot claim that the estate lost value based on the investment in a low interest or non-interest-bearing account. It also cannot claim that it is entitled to interest because it did not have use of the money. Not having use of the money is not a reduction in the value of an asset with the passage of time, and it is the latter that is required by Probate Code section 9601, subdivision (a)(1).

As the lower court explained, the Opera Association had various remedies available to it to address Flickinger's delay. It could have petitioned the court for his removal or filed a petition under Probate Code section 12202 to address his failure to administer the estates in a timely manner. The Opera Association did not avail itself of these remedies. Nothing in the Probate Code requires the lower court to impose interest on the full value of the estate based on the unreasonable delay in receiving the assets in the estate. (See *Nickel v. Bank of America Nat. Trust & Savings Assn.* (N.D.Cal. 1997) 991 F.Supp. 1175, 1177–1180 (*Nickel*) [interpreted Prob. Code, § 16440, subd. (a)(1), which states that a trustee is chargeable for " '[a]ny loss of depreciation in value of the trust estate resulting from the breach of trust, with interest' " as not allowing an award of compound interest].)

Probate Code section 9601, subdivision (a)(1) clearly states that the unreasonable delay in distribution must result in "depreciation" or reduction in the value of the estate. Here, the lower court correctly imposed interest on the bond premiums because they resulted in a loss of value to the estates. The probate court properly rejected the Opera Association's request for interest on the total value of the assets when the evidence showed that Flickinger's delay did not lower the value of the accounts in the estates other than by the amounts spent for the bonds.

D. *Civil Code Section 3287 Does Not Apply to the Kampen Estate*

The lower court found that Civil Code section 3287 does not apply to probate cases where it is alleged that the personal representative administrator failed to administer an estate in a timely fashion. The Opera Association claims that this ruling was error and, with regard to the Kampen estate, it was entitled to prejudgment interest.

Civil Code section 3287 provides the following: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by

calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, including the state or any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state. [¶] (b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

■ As the lower court found, the Opera Association is a residuary beneficiary, not a recipient of damages. The term "damages" refers to monetary compensation recoverable by a person who has suffered detriment from the unlawful act or omission of another. (Civ. Code, § 3281.) Although this statute generally applies to contract cases, it also may apply to a judgment if the judgment is the act by which damages become certain or capable of being made certain. (See *Pinecrest Productions, Inc. v. RKO Teleradio Pictures, Inc.* (1970) 14 Cal.App.3d 6, 12 [92 Cal.Rptr. 44].)

Here, there was no money judgment or contract, and the Opera Association, as the residuary beneficiary, did not have a claim of damages. Furthermore, the Opera Association did not have a right to distribution of the assets in Kampen's estate that vested on a particular day. Thus, under the plain language of Civil Code section 3287, subdivision (a), the Opera Association is not entitled to interest under this statute.

■ The Opera Association maintains that "there is no meaningful distinction between a standard judgment in a civil case that awards money damages to a plaintiff and a judgment or order of final distribution of a probate estate that orders distribution of cash to the beneficiary." It then repeats its argument that an order of distribution is a money judgment. As already discussed, we reject this argument that an order of distribution is a money judgment. Under the plain language of Civil Code section 3287, subdivision (a), this provision does not apply to an order of distribution.

Subdivision (b) of section 3287 of the Civil Code, which authorizes interest in cases involving unliquidated contract claims, also plainly does not apply. The Opera Association did not have a contract with Flickinger or Kampen that entitled it to damages.

The Opera Association's argument that subdivision (b) of Civil Code section 3287 applies is flawed and not supported with authority. The Opera

Association's contrived argument is that once Flickinger was appointed an executor by the court and accepted these duties, he agreed to carry out Kampen's wishes as set forth in the will. It maintains that when Flickinger failed to fulfill his responsibilities he breached his "contractual relationship" with Kampen under the will that named him the executor and breached his "contract" with the court that appointed him executor. It then asserts that the Opera Association was a third party beneficiary of both of these contracts.

This foregoing argument merits little discussion. It is elementary that a contract requires an offer and acceptance, which were clearly missing in either of the "alleged" contracts. Flickinger's duties derived from statutes, not a contract. The Opera Association's assertion that the court's appointment of an executor constitutes some type of contract is a novel, but absurd, argument.

### III. *The Rulings on the Requested Nonstatutory Damages*

#### A. *The Opera Association's Alternative Measurements of Damages*

The Opera Association contends that even if the lower court correctly ruled on its requests for statutory damages, the court erred as a matter of law by refusing to consider any other measure of delay damages.

Specifically, the Opera Association complains that the lower court rejected its two alternative measurements of damages. The Opera Association had requested interest based on the performance of its endowment fund. It proposed that interest could be calculated as the amounts the Opera Association allegedly lost by not being able to invest the money from the estates. The second method proposed was that interest could be calculated based upon the increased interest costs the Opera Association had to incur by having to borrow funds to replace the amounts it had not timely received.

The lower court did explain that the Probate Code did not authorize the award of damages based on the two alternative measurements proposed by the Opera Association. However, it provided an independent basis for rejecting these requests; it also ruled that "any amount so calculated" was "speculative and without support." The Opera Association ignores this second, independent, basis for denying its request.

The court's ruling that the Opera Association's requests for damages were speculative and not supported by the evidence is not reviewed de novo. "[I]t is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.' " (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 [105 Cal.Rptr.2d

88].) Only the determination of whether the Opera Association is entitled to a particular measure of damages is a question of law subject to de novo review. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315 [96 Cal.Rptr.2d 747, 1 P.3d 63].) The court's independent basis for rejecting the Opera Association's claims for damages based on the damages being speculative and not supported by the evidence will be affirmed if the ruling is supported by substantial evidence. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078 [81 Cal.Rptr.2d 46].)

"Under the substantial evidence standard of review, 'we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266 [35 Cal.Rptr.3d 343].) "All presumptions favor the trial court's ruling, which is entitled to great deference . . . ." (*Westphal v. Wal-Mart Stores, Inc., supra*, 68 Cal.App.4th at p. 1078.)

On appeal, the Opera Association fails to cite to any evidence in the record that supports its requests for damages. Accordingly, we must conclude that the lower court's findings that the requested damages were not supported by the evidence and were speculative were correct. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].)

Additionally, we also agree with the lower court's finding that the Probate Code did not authorize the measurement of damages urged by the Opera Association. The only statute the Opera Association cites in support of its argument that it was entitled to these measurements of damages is Probate Code section 9603. This statute simply provides that sections 9601 and 9602 of the Probate Code "for liability of a personal representative for breach of a fiduciary duty do not prevent resort to any other remedy available against the personal representative under the statutory or common law." The Law Revision Commission comment to Probate Code section 9603 provides: "The section merely retains remedies that existed before the enactment of Sections 9601 and 9602; it does not create any *new* remedies against a personal representative." (Cal. Law Revision Com. com., 53A West's Ann. Prob. Code (1991 ed.) foll. § 9603, p. 518, italics added; see also *Nickel, supra*, 991 F.Supp. at pp. 1184–1185 [when considering the language in Prob. Code, § 16442, which has essentially the same language as that in Prob. Code, § 9603, but applies to trustees, the federal district court stated that "it is

highly unlikely that the [L]egislature would have defined specific remedies [elsewhere in the Probate Code], only to have them trumped by other common law remedies or by such a general section as [Probate Code section] 16442"].)

As already discussed, the lower court awarded the Opera Association the damages available under the statutory law, and no statute authorized damages based on the two alternative methods urged by the Opera Association. Probate Code section 9603 did not authorize the damages requested by the Opera Association but permits a court to use a remedy created by the case law prior to the enactment of Probate Code sections 9601 and 9602. As we discuss below, the case law did not require the lower court to impose any additional surcharge on Flickinger.

B.   *Case Law Does Not Require the Imposition of Damages*

The Opera Association contends that the lower court failed to follow case precedent when it acknowledged that Flickinger's delay in distributing the assets from the estates was unreasonable and unjustified, but then refused to award the Opera Association interest on the money in the estates of Ellington and Kampen. In support of this argument, they rely on cases over 90 years old. (See *Estate of James Holbert* (1870) 39 Cal. 597; *In re Hilliard* (1890) 83 Cal. 423 [23 P. 393]; *St. Mary's Hospital v. Perry* (1907) 152 Cal. 338 [92 P. 864]; *Estate of Piercy* (1914) 168 Cal. 755 [145 P. 91].)

The trial court found that these four cases were distinguishable from the present case because the personal representative in the cited cases had committed an intentional wrong and had not simply delayed unreasonably the distribution of the estate.[4] A brief summary of these cases supports the lower court's conclusion that each case involved some intentional wrongdoing by the personal representative.

---

[4] In its reply brief, the Opera Association also cites to the *Estate of Guglielmi* (1934) 138 Cal.App. 80 [31 P.2d 1078]. In this case, the executor paid himself extraordinary fees without a court order. (*Id.* at p. 89.) The court held as follows: "Extraordinary fees are allowed an executor within the discretion of the probate court and unless and until an order is made there is no obligation on the part of the estate to pay more than the statutory fees. Hence, when an executor upon his own motion withdraws the funds of an estate to pay himself fees in addition to the amount allowed by statute, he is to be charged with the amount thereof with interest thereon from the date of withdrawal." (*Id.* at pp. 89–90.) Thus, this case too, involved wrongdoing of the executor, which, as already stressed, is not the situation with the present case.

The Opera Association also refers to *Fidelity & Deposit Co. of Maryland v. Lindholm* (9th Cir. 1933) 66 F.2d 56 in its reply brief. However, the Ninth Circuit did not address the issue of interest. Rather, the court merely stated in the portion of its decision that sets forth the facts that the superior court imposed interest. (*Id.* at p. 57.) "[A]n opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

The oldest case cited by the Opera Association, *Estate of James Holbert, supra*, 39 Cal. 597, involved an express trust to loan money on good security and, instead of complying with the direction of the will, the executor used the money himself. (*Id.* at pp. 600–601.) The court stated that "[i]t was a misappropriation of the funds of the estate in his hands, to have mingled them with his own affairs, and employed them in the prosecution of his private business." (*Id.* at p. 601.) The court held that the measure of damages, at the option of the beneficiary, is either the legal interest rate or the measure of profit realized by the executor. (*Ibid.*)

In *In re Hilliard, supra*, 83 Cal. 423, the appellate court concluded that the executors unreasonably delayed settling and distributing an estate. (*Id.* at p. 427.) They did not profit from the use of the estate's funds, but did use the money of the estate and mingled the estate's assets with the executors' own funds. (*Id.* at pp. 426–427.) The appellate court determined that it was immaterial that the executors did not derive any benefit by using the money because it was "enough that they kept it for their own use, and used it whenever they had use for it. The law requires executors and guardians to account not only for all profits they realize from the use of the money intrusted to them, but also for both principal and interest, in case of loss by their unauthorized use of such money." (*Id.* at p. 428.) The court ordered the lower court to charge the executors with interest, to be compounded annually. (*Ibid.*)

The appellate court in *St. Mary's Hospital v. Perry, supra*, 152 Cal. 338, was concerned with the damages awarded after the lower court had granted a judgment on the pleadings. (*Id.* at p. 340.) The defendant executor failed to pay the money to the hospital after the decedent had left a cash bequest to the hospital for purposes of endowing a bed for the poor in memory of her late husband. (*Id.* at pp. 340–341.) The defendant executor refused to pay the money because the hospital refused to provide and maintain such a bed permanently after it was informed that the bequest was insufficient for a permanent bed. (*Id.* at p. 341.) The court stated that the "[d]efendant executrix ha[d] no supervisory power . . . [and was] called upon by the decree simply to deliver the property distributed. She ha[d] no right to require from the distributee any agreement as to the performance of the trust as a condition precedent to delivery . . . ." (*Id.* at p. 343.) The court concluded that allowance of interest "[i]n cases of this character" from the time the executor or administrator should have paid the money to the distributee was proper and chargeable against the individual executor. (*Ibid.*)

The Opera Association stresses that the personal representative did not misappropriate the funds in *St. Mary's Hospital v. Perry, supra*, 152 Cal. 338. The executor, however, did engage in misconduct when she refused to

distribute the money as required because she unilaterally decided that the beneficiary could not receive its bequest unless it contributed its own funds to make the endowment permanent. Furthermore, the court stated, "In cases of this character the allowance of interest from the time the executor or administrator should have paid the money to the distributee is proper." (*Id.* at p. 343.) Thus, the court did not state that interest was required. Rather, it simply held that it was proper for the lower court to order interest from the point in time the executor wrongfully forced a condition on the beneficiary before agreeing to distribute the assets.

Finally, in *Estate of Piercy, supra,* 168 Cal. 755, the court reversed the portion of the lower court's order that refused to charge the administrator with compound interest on the rental value of the land of the estate. (*Id.* at p. 756.) The appellate court concluded, "Where, as here, the settlement of the estate has been long delayed and the administrator has himself used funds belonging to the estate, the heirs will not be fully compensated unless they receive compound interest upon the property of the estate thus withheld." (*Id.* at p. 757.) The court elaborated: "The only reason for the long delay was that the administrator asserted a claim to the lands against the estate. This claim was adjudged to be based upon his own fraud and undue influence. The fact that he set it up and litigated it cannot entitle him to any special consideration. It is equally clear that the administrator violated his trust by using the property of the estate for his own benefit in conjunction with property belonging to him. There may be cases in which the trial court may, in the exercise of a sound discretion, grant or deny compound interest. Here, however, the misconduct of the administrator was so clearly shown that there was no room for the play of discretion." (*Id.* at p. 758.)

As the lower court in the present case found, the personal representative in the foregoing cases engaged in some misconduct. The personal representative used or mingled the funds from the estate or engaged in some type of misconduct, which caused the delay. The Opera Association maintains that the lower court's focus on this factor was incorrect because these cases imposed a penalty such as compound interest for the misconduct, and simple interest should be imposed for unreasonable delay. Further, it asserts— without citing to any supportive authority—that negligent delay is so uncommon that no court has had to address the particular facts as presented in this case.

Firstly, we do not accept the Opera Association's unsupported premise that negligent delay by a personal representative is uncommon. Indeed, the Legislature anticipated that an administrator may delay distributing an estate and provided a remedy under Probate Code section 12202. Probate Code section 12202 provides the following: "(a) The court may, on petition of any

interested person or on its own motion, for good cause shown on the record, cite the personal representative to appear before the court and show the condition of the estate and the reasons why the estate cannot be distributed and closed. [¶] (b) On the hearing of the citation, the court may either order the administration of the estate to continue or order the personal representative to petition for final distribution . . . ."

■ Secondly, implicit in the Opera Association's argument is that Flickinger must be punished for his delay but courts have made clear that punishment is not the basis for requiring a personal representative to pay interest. "The rule which makes an executor or other trustee chargeable with compound interest upon trust funds used by him in his own business[,] is not adopted for the purpose of punishing him for any intentional wrongdoing in the use of such fund, but rather to carry into effect the principle enforced by courts of equity, that the trustee shall not be permitted to make any profit from the unauthorized use of such funds." (*Miller v. Lux* (1893) 100 Cal. 609, 616 [35 P. 345], superseded by statute on another issue.) Thus, integral to the rule of imposing interest is the principle of preventing the personal representative from making any profit from the unauthorized use of such funds. If the personal representative does not make any unauthorized use of such funds and does not engage in any wrongdoing, we agree with the lower court that imposing interest is not required.

■ Thirdly, some courts have indicated that simple interest is appropriate when the misconduct is negligent and compound interest is proper when the misconduct is willful. The court in *Estate of McSweeney, supra*, 123 Cal.App.2d 787 explained that an executor, even when also a devisee, cannot "use funds of the estate available to him in his official capacity for his individual needs." (*Id.* at p. 792.) If the executor uses the money, the executor is liable for the moneys used and "for interest thereon." (*Ibid.*) The court proceeded to distinguish negligent expenditures from willful expenditures. It noted that compound interest should be charged if the expenditure was willful, but simple interest should be charged if the expenditure was negligent. (*Ibid.*) Similarly, in *Estate of Guglielmi, supra*, 138 Cal.App. 80, a case upon which the Opera Association relies, the court did not impose compound interest, but imposed simple interest when the executor wrongly took extraordinary fees without a court order. (*Id.* at pp. 89–90.) Here, as already stressed, there was no misconduct—either willful or negligent—and interest was not *required*.

Accordingly, we reject the Opera Association's argument that the case law required the lower court to impose interest based on Flickinger's unreasonable delay in distributing the cash in the estates of Ellington and Kampen.

## C. The Doctrine of Laches

### 1. The Lower Court's Findings

The probate court ruled that the Opera Association had the right to bring an action against Flickinger for failing to distribute Ellington's estate. (See Prob. Code, § 11750.) The court, however, determined that the Opera Association failed to act and enforce its rights in a timely manner, which precluded any recovery other than the statutory damages ordered. The court refused to require Flickinger to pay interest under common law (see, e.g., *St. Mary's Hospital v. Perry, supra,* 152 Cal. 338), as it concluded that Flickinger's affirmative defense of laches barred the Opera Association's claim for interest. Similarly, with regard to the Kampen estate where there was no final distribution, the court found that even if there was some theory permitting the Opera Association to seek interest, laches barred any claim for interest because the Opera Association failed to assert its rights in a timely fashion.

Flickinger failed to administer the Kampen estate in a timely fashion but there was no order for final distribution. The Opera Association cannot claim it is entitled to interest on money not yet distributed from Kampen's estate based on any of the case decisions it cites. Accordingly, we do not need to consider the affirmative defense of laches as it relates to the Kampen estate. However, for the same reasons discussed below regarding the Ellington estate, we conclude that laches would bar any claim for damages not based on a statute with regard to Flickinger's administration of the Kampen estate.

### 2. Principles of Laches

"Laches is an equitable defense." (*Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 323 [51 Cal.Rptr. 437].) " 'The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' " (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 68 [99 Cal.Rptr.2d 316, 5 P.3d 874]; see *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617] (*Conti*).)

" 'Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances . . . .' " (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1286 [258 Cal.Rptr. 795].) However, the issue may be addressed as one of law if the facts are undisputed. (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 607 [51 Cal.Rptr.2d 897], overruled on another issue in *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 402–403 [83 Cal.Rptr.2d 836].)

### 3. *The Availability of the Defense of Laches*

The Opera Association asserts that laches cannot be an affirmative defense to an enforcement of a judgment. (See, e.g., *United States Capital Corp. v. Nickelberry* (1981) 120 Cal.App.3d 864, 867 [174 Cal.Rptr. 814]; *Pratali v. Gates* (1992) 4 Cal.App.4th 632, 645 [5 Cal.Rptr.2d 733].) "It is well settled that the equitable defense of laches does not apply in an action based on a judgment, which is an action at law." (*Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 315 [54 Cal.Rptr.2d 679] [laches not a defense to the plaintiff's action to enforce a judgment that awarded the plaintiff damages for breach of contract].)

Laches does not apply in an action of law (*Barkley v. City of Blue Lake, supra,* 47 Cal.App.4th at p. 315), but the present action was not an action at law. The Opera Association was not seeking legal remedies in its petition involving the Ellington estate. The Opera Association, in its role as a beneficiary, filed a petition to surcharge Flickinger, the administrator of the estate of Ellington, for breach of his fiduciary duty. The court held a trial on the petitions to surcharge and acted as "the trier of fact, sitting in the exercise of the probate jurisdiction of the Superior Court."

A probate court "is a court of general jurisdiction." (Prob. Code, § 800.) It has no general equity jurisdiction, since its general jurisdiction is confined to the settlement of the estates of deceased persons. (*Security-First Nat. Bk. v. Superior Court* (1934) 1 Cal.2d 749, 757 [37 P.2d 69].) It has the power to apply principles of equity in aid of its functions as a probate court. (*Ibid.*) Laches is an equitable defense. Consequently, the lower court had the authority to consider and apply the laches defense.

### 4. *The Affirmative Defense of Laches Against a Claim for Unreasonable Delay*

The Opera Association claims that Flickinger cannot assert the defense of laches because the "wrong" committed by Flickinger was an unreasonable delay in carrying out his fiduciary duties. The Opera Association asserts, without citing to any authority, that "laches was not intended to apply to such a situation."

Laches is "an unreasonable delay in asserting an equitable right, causing prejudice to an adverse party such as to render the granting of relief to the other party inequitable." (*In re Marriage of Plescia* (1997) 59 Cal.App.4th 252, 256 [69 Cal.Rptr.2d 120].) There is nothing inequitable about permitting the defense of laches against a claim that is based on delay.

Contrary to the Opera Association's argument, courts have applied a laches defense against a plaintiff's claim that the defendant's delay was unreasonable. For example, in *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245 [102 Cal.Rptr.3d 394], we considered a developer's petition that the city's delay beyond one year in certifying an environment impact report (EIR) should result in the city's having to certify the EIR, even though the city alleged the EIR was insufficient. (*Id.* at p. 1255.) We held that the plaintiff developer acted with unreasonable delay and "acquiesced" in the city's taking more than a year to certify an EIR and therefore laches barred the claim. (*Id.* at p. 1270.)

We conclude that the lower court properly considered the defense of laches in this case.

### 5. *Evidence in Support of the Finding of Laches*

As already noted, in order to establish laches, the defendant must show that the plaintiff unreasonably delayed pursuing the claim " 'plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' " (*Johnson v. City of Loma Linda, supra*, 24 Cal.4th at p. 68.) On appeal, the Opera Association does not mount any challenge to the lower court's finding that it unreasonably delayed pursuing any action against Flickinger. Moreover, the evidence amply supported such a finding. The evidence shows that on June 25, 1996, Mason, who was then the associate director of planned gifts for the Opera Association, wrote a memorandum stating that Flickinger indicated that the opera could expect "between $250,000 and $500,000 combined from the Kampen and Ellington estates." Although the Opera Association knew of this bequest in 1996, it did not file its petitions for surcharge until January 2009. This delay of more than 10 years was clearly unreasonable.

■ The Opera Association does, however, maintain that the record contained no evidence that the delay caused any prejudice to Flickinger. "Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue." (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].) The Opera Association asserts that the only evidence of any prejudice was Flickinger's testimony that "it would have been nice if they had been on my tail" and his lawyer's argument that his client was prejudiced because the statutory interest that had accrued constituted "ridiculously excessive damages."

The lower court did not expressly address the issue of prejudice. It did, however, find that the Opera Association "could have brought an action

against Mr. Flickinger at any time before January 23, 2009, but failed to do so and slept on its rights despite having knowledge of the amount owing. . . . By failing to act and failing to enforce its rights, laches attach and preclude recovery." Although not addressed by the Opera Association or Flickinger, the lower court implicitly found acquiescence in the delay. Acquiescence, without a finding of prejudice, is sufficient for the court to apply the equitable defense of laches. (See *Johnson v. City of Loma Linda, supra,* 24 Cal.4th at p. 68.)

Here, the record contains substantial evidence supporting a finding that the Opera Association acquiesced in Flickinger's act of delaying distribution of the assets in the Ellington estate. As already noted, the Opera Association knew about the bequest on June 25, 1996. In 1996, Flickinger told the Opera Association that it could expect "between $250,000 and $500,000 combined from the Kampen and Ellington estates" "within one year." In 1998, Flickinger told the Opera Association that he had "one sizable problem with each estate and as a result ha[d] no idea when everything [would] be settled." At the end of 1998, Flickinger filed a first and final account and report for the Ellington estate and a petition for its settlement; a copy of the notice of the hearing on the petition was mailed to the Opera Association. The evidence established that the Opera Association believed it received a copy of the 1999 order in 2002.

Despite knowing about the bequest in 1996 and receiving the 1999 order by 2002, the Opera Association did not contact Flickinger after 2002 until November 2008. It filed its petitions in January 2009. This is abundant support for a determination that the Opera Association itself acted with unreasonable delay, and that it acquiesced in Flickinger's taking more than eight years to distribute the cash in Ellington's estate.

Although the Supreme Court's use of the disjunctive word, "either," indicates that evidence of acquiescence without evidence of prejudice is sufficient to support a finding of laches (*Johnson v. City of Loma Linda, supra,* 24 Cal.4th at p. 68; *Conti, supra,* 1 Cal.3d at p. 359), we note that some courts have indicated that prejudice must always be proved. (See, e.g., *Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1157 [63 Cal.Rptr.3d 713].) We need not address the necessity of proving prejudice when acquiescence is demonstrated, because this record also supports a finding of prejudice. If the decision of the trial court is correct on any theory of law applicable to the case, the appellate court will affirm the judgment, whether the trial court's reasons were correct or not. (*Pasadena Medi-Center Associates v. Superior Court* (1973) 9 Cal.3d 773, 779, fn. 6 [108 Cal.Rptr. 828, 511 P.2d 1180], superseded by statute on another issue.)

Flickinger argues that he suffered prejudice because the Opera Association's delay resulted in his not having records such as tax records and bank records. Flickinger does not support this assertion with any citation to the record and therefore we will not consider this argument. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [19 Cal.Rptr.3d 416] [failure to support an argument with the necessary record citations will result in waiver of the argument].)

Flickinger also asserts that the record establishes that the delay resulted in the possibility of his suffering serious economic harm, which constitutes prejudice. He argues that our Supreme Court in *Conti, supra,* 1 Cal.3d 351 recognized that the risk of financial loss to a defendant asserting laches can constitute prejudice and he quotes the following from this decision: "[T]he employing agency might be compelled to incur a double payment consisting of back pay to the discharged employee and salary to his replacement." (*Id.* at p. 360, fn. omitted.) The record, according to Flickinger, showed that the Opera Association was seeking more than $600,000 against him based on his delay in distributing the cash in the estates.[5]

Our Supreme Court in *Conti* did not suggest that the *risk* of financial loss was sufficient to prove prejudice. To the contrary, the court explained that a public agency was not entitled to a conclusive presumption of prejudice and noted a public agency raising the defense of laches against a claim by an employee for reinstatement could easily establish prejudice by showing that reinstatement required discharge of a substitute employee or compelled the employing agency to incur a double payment consisting of backpay to the discharged employee and salary to the replacement. (*Conti, supra,* 1 Cal.3d at p. 360.) When rejecting the public agency's argument that the court should "impose a presumption shifting the burden of proof of prejudice to the employee," the court emphasized that the employing agency enjoyed better "access to data respecting prejudice" and should bear the burden of producing the pertinent evidence. (*Id.* at p. 361.) Thus, the court does not suggest that the *risk* of injury establishes prejudice; the defendant must *establish* an actual injury resulting from the delay.

Here, however, the delay did cause Flickinger economic injury. Had the Opera Association not delayed its request for the cash from Ellington's estate, Flickinger would have been discharged earlier and would have had the bond

---

[5] Cullison testified that she believed that the Opera Association was requesting $300,000 or more as damages for the delay based on the statutory legal interest rate of 10 percent. Counsel for Flickinger responded: "[L]et me ask you this, under the statutory damages award measure, do you know what the amount would be that the opera [association] is asking from Mr. Flickinger?" Cullison answered that she did not recall. Counsel asked, "Would over $600,000 sound about right?" She replied, "Sounds familiar, yes."

exonerated. Consequently, he would not have had to pay the bond premiums from 1999 until 2008 for the sum of $9,164.63 (total bond premium of $5,641.01 + total interest of $3,523.62).

Accordingly, we conclude that sufficient evidence supported the lower court's finding that Flickinger's affirmative defense of laches barred any claim for interest on the cash in Ellington's estate.

## IV. *Amending the 1999 Order*

Flickinger filed a supplemental account on April 28, 2009, and a status report regarding the IRA's on May 4, 2009. He reported that two IRA's were incorrectly inventoried as part of the Ellington estate. He stated that these accounts were not part of the Ellington estate but actually part of Kampen's estate. He submitted an amended accounting. Flickinger filed a supplemental account in the Kampen estate on July 21, 2009. This accounting added the IRA's.

The court filed on September 7, 2010, its "amended order for final distribution under will, and settling first and final report of executor and surcharge." The court amended the 1999 order to reflect that it had surcharged Flickinger the bond premiums paid plus the interest on those bonds for a sum of $9,164.63 (total bond premium of $5,641.01 + total interest of $3,523.62). The court deducted the amount in the IRA's that Flickinger originally believed were part of the Ellington estate, but were actually part of the Kampen estate, from the total cash in the Ellington estate. The court amended the amount in the residue of the Ellington estate, which was "approximately $283,900.59" in the 1999 order, to $248,879.59. The court also amended the 1999 order to deny Flickinger compensation. The court ordered Flickinger, in his personal capacity, to pay the Opera Association $23,559.71, the total of all surcharged amounts pertaining to this estate.

The Opera Association claims the probate court did not have the authority to modify the amount of "approximately $283,900.59" in the 1999 order to $248,879.59. Not surprisingly, the Opera Association does not mount any challenge to that portion of the order surcharging Flickinger $23,559.71. The Opera Association complains that the mistake regarding the IRA accounts was Flickinger's problem and he did not inform the court about his mistake within six months of the 1999 order, as required under Code of Civil Procedure section 473, subdivision (b). The Opera Association argues that the court did not have the authority to amend the 1999 order. It also claims that the $248,879.59 bears no relationship to the accounts in Ellington's estate.

■ The jurisdiction of the probate court is in rem and the res is the decedent's estate. (*Estate of Radovich* (1957) 48 Cal.2d 116, 121 [308 P.2d 14].) When an order for final distribution becomes final, it is conclusive as to the rights of all interested persons. (Prob. Code, § 11705, subd. (b).) Thus, the 1999 order was final. Once a decree to distribute a decedent's estate has become final, the probate court loses jurisdiction over the estate's property except as necessary to carry out that order, and any other orders are null and void. (*Estate of Dow* (1957) 48 Cal.2d 649, 652–654 [312 P.2d 1].) A decree of distribution is conclusive on all parties thereto even though erroneous and even though the record itself shows that it is erroneous. (See, e.g., *O'Brien v. Nelson* (1913) 164 Cal. 573, 575 [129 P. 985] [decree of distribution not void when it erroneously referred to the property as community rather than separate property]; *Estate of Loring* (1946) 29 Cal.2d 423, 432 [175 P.2d 524] [erroneous decree of distribution is final]; *Estate of Buckhantz* (1958) 159 Cal.App.2d 635, 645–646 [324 P.2d 317] [decree was clearly erroneous because it failed to consider the apportionment of estate and inheritance taxes when dividing the property, but it was final and could not be changed].)

Although not discussed by either party, the probate court in 1999 never had jurisdiction over the IRA accounts. This is not a situation where the decree contains errors or is simply erroneous. In all of the cases cited by the Opera Association where the court did not have jurisdiction to modify or change an erroneous distribution order, there was no dispute that the court had jurisdiction over that property when it issued the erroneous order of distribution. Here, Flickinger presented undisputed evidence that the IRA accounts were in Kampen's estate; they were actually never in Ellington's estate. Indeed, the Opera Association has not protested the court's award of that money to it in the final distribution regarding Kampen's estate. Obviously, the IRA accounts cannot belong to two estates.

■ A judgment or order is void in the fundamental sense if the court rendering it lacked jurisdiction over the subject matter or the parties. Subject matter jurisdiction relates to the inherent authority of the court to deal with the case or matter before it. (*Carlson v. Eassa* (1997) 54 Cal.App.4th 684, 691 [62 Cal.Rptr.2d 884].) As already discussed, the court's in rem jurisdiction over Ellington's estate did not include the IRA accounts because these accounts were not part of Ellington's estate. ■ A probate court may vacate orders void on their face. (*Security-First Nat. Bk. v. Superior Court, supra*, 1 Cal.2d at pp. 752–753, superseded by statute on another issue; see also *Neubrand v. Superior Court* (1970) 9 Cal.App.3d 311, 317 [88 Cal.Rptr. 586].)

Furthermore, the court's amending the 1999 order did not prejudice the Opera Association because it received this money from the distribution of Kampen's estate. To the extent the Opera Association is claiming that it should receive the money from the same accounts twice and Flickinger should personally pay the sum that was not properly part of the Ellington estate, it has presented no authority or reason for providing it with such a windfall. The Opera Association does assert that it suffered prejudice because the mistake regarding the amount of cash in these estates resulted in a too high bond for the Ellington estate and a too low bond for the Kampen estate. This argument might have some force if there were a different beneficiary for the Kampen estate. Since the Opera Association was the beneficiary of both estates, it did not suffer any loss because, presumably, the increased cost of the bond in one estate was cancelled out by the lower cost of the bond in the other estate.

Finally, we reject the Opera Association's assertion that the court's order that the five accounts in Ellington's estate total $248,879.59 has no "relation to reality." This amount was the sum Flickinger paid to the Opera Association on January 5, 2009. Flickinger testified on March 24, 2009, at the very first hearing on the Opera Association's petitions, that he had paid the Opera Association all the cash in the Ellington estate except for the money in the two IRA's.[6] Thus, once he discovered that the IRA's were not part of the Ellington estate, the evidence was that he had paid the Opera Association all of the money in the Ellington estate. Furthermore, the amended order identified the account numbers, and the Opera Association does not point to any evidence in the record establishing that the sums in these accounts do not equal the total amount in the amended order. The Opera Association's conclusory statement that there was no basis for the amount in the order does not establish error.

Accordingly, we conclude that the lower court did not err in amending the 1999 order to deduct the cash in the IRA's, since the court in 1999 never had jurisdiction over these accounts.[7]

---

[6] He testified that the IRA's were in Washington Mutual Bank, but the evidence showed they were in Great Western Bank.

[7] We note that although the Opera Association challenges the lower court's authority to amend the final distribution order, it does not mount any challenge to the modification that resulted in Flickinger's having to repay the estate the amount of compensation he received under the original 1999 order for administering the estate. In any event, the court had the authority to reduce the compensation of Flickinger under Probate Code section 12205.

## DISPOSITION

The probate orders are affirmed. The Opera Association is to pay the costs of appeal.

Haerle, Acting P. J., and Richman, J., concurred.