Filed 7/10/14  Rumph v. Mayo CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PAMELA ESTELLE RUMPH, | B248765 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SP006992) |
| v. | |
| TERRY MAYO, as Co-Trustee, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Linda K. Lefkowitz, Judge.  Reversed in part; affirmed in part.

John L. Dodd & Associates and John L. Dodd for Defendant and Respondent.

Law Offices of David R. Akin and David R. Akin for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant, Terry Mayo appeals from the probate court's[1] order removing him as trustee. Defendant was co-trustee of a trust and all sub-trusts. Plaintiff, Pamela Estelle Rumph, a beneficiary of the trust, filed a petition to remove defendant and Foster Rains as co-trustees under Probate Code[2] section 17200. On March 12, 2013, the probate court removed defendant and Mr. Rains as trustees. The basis of the order was hostility between the co-trustees and the beneficiaries. Defendant contends the trial court erred in removing him as trustee from all the trusts. Defendant also contends plaintiff should be found in violation of the trust's no-contest provision. We agree he should not be removed as a trustee but reject his no-contest clause claims. But we conclude the probate court did not possess the discretion in this case to remove defendant as a trustee. Hence, we reverse the order removing him as a trustee.

Plaintiff filed her own cross-appeal contending defendant should be found in breach of trust provisions and surcharged. Plaintiff argues defendant violated section 15686, subdivision (b) when he failed to provide her written notice of an alleged increase in trustee's fees. Plaintiff's contentions concerning defendant's alleged misconduct have no merit.

---

[1] There are three judges who made rulings in this case. We will refer to two of them, Judges Craig Karlan and Joseph S. Biderman, by their titles and names. For ease of reference, we will refer to Judge Linda K. Lefkowitz, who conducted the trial, as the probate court.

[2] Further statutory references are to the Probate Code unless otherwise specified.

2

## II.  BACKGROUND

### A.  Day Family Trust, Marital Trust, Survivor's Trust And Sub-Trusts

Frank and Janice E. Day founded Jafra Cosmetics which they sold to Gillette in the 1970s.  The Days created the Day Family Trust on May 24, 1985.  They were the initial trustees.  They had one daughter, Janna Rumph and three grandchildren, plaintiff, Holly Miles (Holly) and Kip Miles (Kip)[3].

The trust was restated by the sixth amendment on December 15, 1993.  The seventh amendment to the trust was effective September 19, 1994.  The trust provides that upon the death of one of the trustors, the remaining trustor would have full authority to appoint or remove existing trustees.  Additionally, the trust estate was to be divided into separate trusts, known as the:  survivor's trust; exemption trust; marital trust; and the disclaimer trust.  The survivor's trust consists of the surviving trustor's separate property that became subject to the trust and his or her share of the community property.  The marital trust consists of the rest and residue of the deceased trustor's estate.  The exemption and disclaimer trusts are not at issue in this appeal.

Regarding investment power and discretion, section 11.03 of the trust provided: "During such time as the Trustors, or either of them, is serving as a Trustee of this Trust, the fiduciary standards shall be broadly interpreted in the Trustor's favor, providing maximum flexibility and discretion to the Trustors in such matters.  However, once the Trustors are no longer serving as Trustees of this Trust, then the Trustee shall be obligated to exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs . . . .  In investing, reinvesting, purchasing, acquiring, exchanging and selling property for the benefit of this Trust, any successor Trustee shall be mindful of the following:  [¶]  (a)  The Trustors desire that the Trust Estate be conservatively managed

---

[3]  Several individuals share the same last names.  To avoid confusion, they will be referred to by their first names.  No disrespect is intended.

3

to produce a fair return on invested assets while fully protecting the capital. The investment diversification and asset allocation policies should focus on a balance between current income and long term preservation of capital. The Trustee and its investment department should be encouraged to emphasize the long term nature of the Trust investment goals and encourage a focus on the long term horizon versus short term investment results." Successor trustees are also required to render accountings of the trust assets.

The trust also had a no-contest provision at section 13.09, which provides: "If any beneficiary under this Declaration of Trust . . . , whether directly or indirectly: [¶] (a) contests or in any manner attacks or seeks to impair or invalidate any of the provisions of any of the above; [¶] (b) objects in any manner to any action taken or proposed to be taken in good faith by the trustee of that instrument . . . , whether said trustee . . . is acting under court order, notice of proposed action or otherwise; [¶] (c) objects to any construction or interpretation of any instrument described above that is adopted or proposed in good faith by the trustee of that instrument . . . ; [¶] . . . [¶] then, in that event, all such legacies, bequests, devises and interests given under this Declaration of Trust . . . to that person shall be forfeited as though he or she predeceased both Trustors without issue. [¶] Expenses to resist any contest or other attack of any nature upon any provision of this Trust . . . shall be paid from the Trust Estate as expenses of administration."

Mr. Day died on June 15, 1995. Ms. Day became the surviving trustor and trustee. The trust then divided into a marital trust and a survivor's trust. The marital trust became irrevocable upon Mr. Day's death. During her lifetime, Ms. Day was to receive assets from the marital and survivor's trusts for her benefit. Upon the death of the surviving trustor, the grandchildren would receive from the marital trust an amount equal to 25 percent of the net trust. Ms. Rumph, the Days' daughter, was to receive the remainder of the marital trust.

Upon the death of both trustors, Ms. Rumph was to receive, as part of her share, the trust property located in Malibu, California, called "Daybreak" (the Malibu property).

4

The trust provided for Ms. Rumph to live at the Malibu property rent-free during the trust administration. The trustees were required to maintain the residence and pay all taxes, insurance and other pertinent expenses, with the amount charged from Ms. Rumph's trust share. By agreement between the trustees and Ms. Rumph, the Malibu property was part of the survivor's trust.

The marital trust distributed its assets to Ms. Rumph and the grandchildren as follows. Ms. Rumph was to receive payment of the net income of her trust estate share. The trustee had discretion to provide more payment if necessary for "[Ms. Rumph's] proper health, support, maintenance and education . . . ." The entirety of Ms. Rumph's share would be distributed in three phases at ages 45, 55, and 60. The trust also provided regular distribution of trust income to the grandchildren. Like Ms. Rumph's provision, the trustee also had discretion to provide more payment if necessary. The entirety of the grandchildren's share was to be distributed in three phases at ages 35, 45 and 55.

The trust also provides that upon Mr. Day's death, Ms. Day "shall have full and unrestricted power and authority at any time or times to remove the existing" trustee or co-trustee. She also retained the power to appoint a successor trustee or co-trustee. Under section 4.01(f) of the trust, "The Co-Trustees so designated shall be deemed Trustee of all Trusts created under this Declaration of Trust."

On October 3, 1996, Ms. Day resigned as trustee and substituted as her successor trustees defendant and Mr. Rains. Mr. Rains is a Los Angeles Police Department detective from Malibu, California. Mr. Rains met Ms. Day at the end of December of 1995 when she hired him as a security guard. Mr. Rains was to receive $2,500 per month for his role as trustee. This amount increased to $3,500 per month. Ms. Day met defendant in August, 1995. Defendant was from Middlebury, Vermont. Defendant was an employee of Middlebury College involved with fundraising. Ms. Day graduated from Middlebury College. Defendant was to receive $5,000 per month for his role as trustee.

Ms. Day amended the survivor's trust several times with the last version, the eleventh amendment, being executed on June 24, 1997. The eleventh amendment to the survivor's trust: provided for disposition of its assets if the surviving trustor did not

5

exercise her power of appointment; gave a $500,000 gift to Middlebury College; and divided $1 million into separate sub-trusts for the grandchildren. The trustees were to distribute from these sub-trusts quarterly amounts equal to the gross earnings from the beneficiary's employment, personal services or business income. The remainder of the survivor's trust would provide quarterly income to Ms. Rumph. Upon Ms. Rumph's death, the survivor's trust assets were to be distributed to her children's sub-trusts. On July 4, 1997, Ms. Day died. The survivor's trust became irrevocable.

## B. Trustee And Beneficiary Interactions Prior To The Filing Of The 17200 Petition

The trustees submitted their first trust accounting report for the period of June 15, 1995 through December 31, 2004. A probate court approved the first accounting of the trust on July 15, 2005. On August 2006, Ms. Rumph, Holly, and Kip filed a petition to remove defendant and Mr. Rains as trustees. The parties settled their dispute on December 19, 2006. Plaintiff was not a party to the August 2006 petition. The trustees submitted their second trust accounting report for the period of January 1, 2005 through September 30, 2006. On January 26, 2007, the probate court approved the second accounting of the trust.

## C. Section 17200 Petition And Pretrial Proceedings

On June 18, 2008, plaintiff filed her section 17200 petition to remove defendant and Mr. Rains as trustees. Plaintiff alleges the trustees committed extreme waste by failing to maintain the Malibu property. Plaintiff argued defendant and Mr. Rains breached their duty to preserve trust property and failed to properly manage trust assets. She requested the trustees' removal from the survivor's trust and her own appointment as successor trustee. Plaintiff also sought a finding that the trustees were in breach of their duties.

6

On August 8, 2008, during a hearing, Judge Karlan ordered a cap of $25,000 for attorneys' fees. Todd Beutler, the trustees' counsel at the time, was present to appear pro hac vice in the action for the trustees. It was unclear whether the cap applied to the demurrer proceedings or to the entire litigation. The exchange between Judge Karlan and Mr. Beutler was as follows. THE COURT: "How much do you expect this will cost reasonably?" MR. BEUTLER: "This hearing from this point forward?" THE COURT: "Yes. If I put a cap. I understand there are concerns. If I say not to exceed $25,000 without court approval?" MR. BEUTLER: "Yes. Our response to demurrer, I think, won't be a lengthy document, Your Honor." THE COURT: "I'm talking about --" MR. BEUTLER: "All the way through, yeah. . . . I think we have done most of the work, Your Honor." THE COURT: "So I'll put a cap on not to exceed $25,000 without further court order. I'm not saying I won't grant it as things go. We will revisit that. But that seems to protect the petitioner and gives you the ability to defend yourselves without him coming out of pocket."

On November 14, 2008, the trustees filed a petition for approval of legal fees related to their demurrer filing. The legal fees totaled $25,943 and the trustees sought approval for the amount above $25,000 in accordance with Judge Karlan's August 8, 2008 order. On January 9, 2009, Judge Karlan considered the petition and continued it to a later date. Judge Karlan also discussed appointing Gary Ruttenberg as an expert regarding attorney's fees.

On July 10, 2009, plaintiff filed an amended petition. She re-alleged her complaints against the trustees for breach of trust regarding maintenance of the Malibu property. She further claimed the trustees improvidently invested the trust's assets resulting in a decline in the corpus. Plaintiff also argued the trustees had paid themselves an excessive amount in the year 2008. On August 28, 2009, Mr. Ruttenberg stated during a hearing regarding the attorney's fees: "My only comment was that they appear to be high. But given the work they have been put to, in my mind they are not necessarily unreasonable. I haven't really written out a report beyond that." On April 23, 2010, Judge Karlan granted plaintiff leave to amend her petition for the second time. Judge

7

Karlan limited plaintiff's proposed amendments only to the survivor's trust. Judge Karlan disallowed reference to the marital trust and other separate trusts. On May 7, 2010, Judge Karlan ruled effective April 30, 2010 that no attorney's or trustee's fees could be charged to the trusts except by court order.

On February 3, 2011, plaintiff filed a second amended petition. Plaintiff alleges: beginning in 2007 the trustees had misrepresented to "Charles Schwab," the accounts' custodian, that they were the beneficiaries and the trust was revocable; defendant comingled his personal accounts with that of the trust; the trustees engaged in high risk investments which decreased the trust assets from 2007 to 2009; and the trustees' fees were excessive. Plaintiff requested: the trustees be removed as trustees from the survivor's trust; the trustees be surcharged for all improper investments from September 30, 2006, the last approved accounting, to the date of the petition; and all other available relief. On May 23, 2012, Judge Biderman issued an order limiting the scope of the claims from February 3, 2008 to the filing of the second amended petition. Judge Biderman also limited any challenge to the 2007, 2008 and 2009 accountings.

## D. The Trial

### 1. Defendant's testimony

Defendant was the lead trustee regarding work with the trust's investment advisers and accountant. Defendant and Mr. Rains wrote checks for disbursements from the marital and survivor's trusts. Defendant distributed checks to plaintiff from her respective sub-trusts. Defendant made certain plaintiff received annual accountings for her sub-trusts.

Defendant discussed section 11.03 of the trust with the Charles Schwab advisors. The two Charles Schwab advisors who provided assistance to defendant were Sean Smallay and Scott Bissell. The Charles Schwab advisors suggested a moderately conservative asset allocation which the trustees approved. Defendant also testified

regarding a certification of trustee form submitted to Charles Schwab signed March 5, 2007. The document contained several errors, including: the trust never being amended; the trust was revocable; listing the trustees as trustors; and New Hampshire law applied to any legal issue. Defendant stated a Charles Schwab employee had filled in the document by computer. Defendant stated he had not seen the document "until discovery." To explain why his signature was on the incorrectly filled form, defendant testified he signed the document in blank.

Defendant testified regarding a private client enrollment with Charles Schwab. The purpose of the enrollment was to receive further attention for the accounts listed. The enrollment form included the following: the main survivor's trust; four sub-trusts; and three personal accounts for defendant. Mr. Smalley, a Charles Schwab advisor, made the decision to submit all the accounts on one form.

Defendant also testified regarding an April 27, 2008 meeting between the trustees and the beneficiaries. Defendant stated the agenda for the meeting was to discuss how to deal with the Malibu property. Defendant testified that plaintiff instead controlled the agenda. Defendant described the meeting as "tense" but stated the animosity did not come from the trustees. Defendant stated plaintiff was agitated during the meeting. Defendant testified plaintiff demanded the right of first refusal concerning the possible sale of the Malibu property. Defendant provided two 2007 accountings to plaintiff regarding her sub-trusts. He gave the 2007 accounting of the main survivor's trust to Ms. Rumph as provided by its terms.

Concerning trustees' fees, defendant testified: "The trustees were taking 75 basis points, and we did that from 1999 through September 30, 2006, 75 basis points; rather than the amount the trust allowed us to take, which was a hundred five thousand [sic] per year. [¶] Then, in 2008, because of the additional volumes of work we were required to do because of the litigation and because we had complaints from the beneficiaries that the decisions we were making were benefiting us in trustees fees, we decided to go to the flat fee, as trust terms allow. [¶] And so an adjustment was made in 2008 to the amount allowed by . . . the trust document, the amendment, which brought it up to $105,000 [sic]

for 2007 and 2008, plus the last quarter of 2006. [¶] In 2009, we reduced our fee voluntarily to $70,000, and that's what we consider it to be today." Seventy-five basis points is the equivalent of three quarters of one percent of the trust assets. The trustees were permitted under the trust to take $102,000 annually. Taking only 75 basis points was significantly lower than the amount allowed under the trust.

The trustees took more than $102,000 as their fees in 2008 as a retroactive adjustment for the previous periods of October 1, 2006, through 2007 and 2008. Defendant noted the 2008 fees in the account summaries. Defendant intended to reflect this increase in a third accounting. However, because of litigation, plaintiff and defendant's lawyers agreed a third accounting was unnecessary. The trustees charged $90,793.93 in fees from the survivor's trust for 2008. Since April of 2010, the trustees took no fees.

On May 11, 2009, defendant's attorneys were paid $129,017.02 from trust funds. Defendant did not secure judicial authorization for the payment of his trust-related attorney fees. This was because it was not until May 7, 2010 that Judge Karlan required approval for any legal or trustee fees. Defendant was asked about Judge Karlan's August 8, 2008 order concerning the $25,000 cap on attorney fees. This was prior to the May 11, 2009 payment of attorney fees for trust-related services. Defendant testified: "I believe that the -- the interpretation of the transcript is confusing and ambiguous. [O]ur attorney felt that only -- that [the] $25,000 figure only applied to the demurrer, and that is the legal advice we followed." Based on a 2009 accounting of the survivor's trust, approximately $246,000 in legal fees was paid without a court order.

### 2. Mr. Rains's testimony

Mr. Rains testified that in 2008, the trustees took more than $160,000 in trustees' fees as an adjustment. Regarding the $25,000 cap on attorney's fees, Mr. Rains thought it applied only to the demurrer proceedings based on the topic that was being discussed by Judge Karlan at the time.

10

### 3. Holly's testimony

Holly is a beneficiary and the Days' granddaughter. She testified that she had no issues with receiving information from the trustees. She attested she wanted other trustees, "Well, there's just been years of . . . history and distrust from all sides . . . there's a lot of . . . hostility and conflict." When asked by defendant's counsel whether the trustees expressed hostility to her, she replied: "I don't -- I mean, they've always just been cordial. But hostility, meaning -- I don't know. I just mean distrust from my side. I can't speak for them."

### 4. Kip's testimony

Kip is a beneficiary and the Days' grandson. He had no personal level of distrust with the trustees. He believed defendant living in New Hampshire created headaches regarding meetings and travel accommodation. He felt it was time for some change.

### 5. Plaintiff's testimony

Plaintiff is a beneficiary and the Days' granddaughter. She testified regarding the April 27, 2008 meeting: "The purpose of the meeting was to talk about the Survivor's Trust and issues relating to the house. Prior to the meeting when I had asked my mom to show me the trust documents and look over whatever she had in her file, there [were] a lot of concerns that I had relating to what I found. I brought to this meeting a list of questions as to the administration of the trusts, the Survivor's Trust and Marital Trust, and voiced my concerns at this meeting." At the meeting, plaintiff received accountings for her sub-trusts in 2007. She also reviewed the accounting for Ms. Rumph's survivor's and marital trusts. Plaintiff recalled Mr. Rains was agitated during the meeting. Plaintiff stated the trustees' attorney, Mr. Beutler, instructed them not to answer questions. And at one point, Mr. Beutler asked plaintiff's secretary to leave the meeting.

11

Plaintiff stated approximately $47,000 in attorney's fees derived from this litigation was charged to her sub-trust specifically. Plaintiff testified that in 2009 she had stored items related to her fashion business at the Malibu property. Plaintiff testified that Mr. Beutler filed a petition to require her to remove the items from the Malibu property. Judge Karlan later ordered plaintiff to cease business activities at the Malibu property on April 23, 2010.

### 6. William Wolf

Mr. Wolf, a certified public accountant, testified on plaintiff's behalf. The survivor's trust had approximately $1.4 million in assets, excluding the real property. He concluded that after the trustees' and legal fees were approved, the survivor's trust would have approximately $846,000. Mr. Wolf did not include the Malibu property's repair costs in his calculation. Mr. Wolf testified that at the time of Ms. Day's death, the investment portfolio of the survivor's trust was 82 percent in tax exempt bonds. From 2008 onward, the assets were distributed about 55 percent in stocks and 45 percent in bonds and cash. Mr. Wolf believed investing the trust funds in approximately half stocks was a moderate investment portfolio, which violated the trust's requirement for a conservative investment. He calculated the trustees' total fees taken in 2008 to be approximately $148,000. Mr. Wolf believed the prudent investor rule applied to the trustees' investments. However, he believed the trust provision was more narrow than the prudent investor rule.

### 7. L. Bruce Norman

Mr. Norman, an experienced bank officer, trustee and attorney, testified concerning issues related to the trustees' compliance with their standard of care. Mr. Norman testified the Uniform Prudent Investor Act, codified at section 16045, applied to the trust. Mr. Norman cited to the survivor's trust, which was intended to

12

provide financial security. Mr. Norman testified that a combination of fixed income and equities would preserve not just the capital, but purchasing power. He stated the trustees' activities regarding investment should be judged at the outset, not at the result. Mr. Norman believed the investment strategy for the survivor's trust's assets complied with its purpose and section 16045. Regarding the private enrollment form that included defendant's and the trust's accounts, Mr. Norman testified no trust breach occurred because the accounts appeared separate. He believed that if one beneficiary caused legal fees to be incurred, it would be appropriate to charge that individual's share with the expenses. Mr. Norman testified that charging one beneficiary would fulfill the trustees' duty of impartiality to the other beneficiaries. Mr. Norman believed the trustees acted in good faith.

### E. Probate Court's Statement Of Decision

On January 7, 2013, the probate court issued its tentative ruling. The probate court noted, "The instant action only involves Petitioner's sub-trust through the survivor's trust." On January 28, 2013, the probate court adopted the January 7, 2013 tentative ruling as its statement of decision.

Concerning the alleged attorney's fees cap violation, the probate court ruled: "Good faith reliance upon the advice of counsel <u>regarding a legal issue</u> will excuse a trustee's errors and omissions. . . . As applied to the instant case, trustee Foster Rains testified without objection that the trustees were advised by then counsel, Mr. Beutler, that the $25,000 'cap' applied solely to proceedings up to and including the filing of a demurrer in the instant action." Regarding Judge Karlan's August 8, 2008 order, the probate court concluded: "It does not appear unreasonable for the trustees' counsel to believe, or for the court to have, in fact, intended, that the proposed 'cap' limited to his work on a demurrer. This belief is substantiated by the fact that on November 8, 2008, the trustees filed a petition to approve payment of fees in the sum of $25,943. Moreover, in so doing, the trustees actually complied with the court's order by additionally seeking

13

instructions re future fees . . . .  [¶]  The record further reflects that the November 8, 2008, request for approval of fees pursuant to the 'cap' was indeed heard on January 9, 2009.  At this time Attorney Gary Ruttenberg was appointed under Evidence Code 730 to provide expert assistance upon various issues, including issues involving fees paid to the trustees' counsel.  The issue of an ongoing $25,000 'cap' does not appear to have been raised thereafter to the Court and/or Mr. Ruttenberg.  To the contrary, on August 28, 2009, Ruttenberg opined that fees were 'high' but not excessive to date.  Neither the Court nor Mr. Ruttenberg nor either side to the litigation raised the issue of a 'cap' at that time, or, indeed, any time subsequent to hearing on the demurrer."

Regarding alleged commingling of funds, the probate court found no evidence that defendant had commingled his personal accounts with that of the trust.  The accounts were individually identifiable and there was no evidence that a joint investment occurred.  The probate court concluded that the trustees did not improperly increase their compensation.  The probate court noted that the trustees had not informed the beneficiaries that they intended to return to their permissible $102,000 annual fees.  However, there was evidence that a third accounting would have occurred which would notify the beneficiaries.  The third accounting was delayed in light of the litigation.  The probate court found a surcharge was unwarranted because the trustees did not violate over time their permissible yearly fees and there was no damage to the trust.

The probate court found Mr. Norman, who testified on behalf of defendant, more persuasive than Mr. Wolf concerning the trust investments.  As noted, Mr. Wolf testified on behalf of plaintiff.  The probate court ruled:  "The Court finds that Petitioner's analysis, as expressed by her financial expert, William Wolfe, is unduly restrictive.  It did not invalidate and did not take into consideration language within the trust that appears to grant greater discretion than testified to by Mr. Wolfe, nor address trustee investment approaches undertaken and testified to by the trustees' designated expert . . . ."  The probate court concluded:  "[T]he Court declines to find the language of trust to be narrowly and absolutely restrictive, requiring as a matter of law that only bonds be purchased.  The court has instead reviewed the trust language as a whole, which appears

14

to reflect that the trustees were concerned with long-term goals, which are, in more recent times, equally served by the diversified investment approach recognized by the [Uniform Prudent Investor Act] and incorporated into California probate law."

The probate court declined to find plaintiff had violated the trust's no-contest clause. The probate court held that the no-contest clause here was enforceable only against frivolous attempts to oust a trustee. The probate court concluded the case was not entirely without merit and therefore not frivolous. The probate court also decided the $47,000 charge against plaintiff's sub-trust for the litigation was not merited because her claims were not frivolous. She directed the trustees to distribute the sum among the various sub-trusts.

Nonetheless, the probate court ordered defendant and Mr. Rains removed as trustees. Regarding the legal authority to remove the trustees, the probate court ruled: "Hostility between beneficiaries and trustees standing alone is insufficient in and of itself to justify removal of a trustee. [Citations.] Because the Court must respect the right of a trustor to choose her trustees, there must be a clear showing that the best interests of the estate require removal. [Citation.] It is only when hostility impairs the proper administration of the trust that the Court may exercise its equitable removal jurisdiction. [Citations.]"

The probate court noted formal and informal disputes between the beneficiaries and trustees had been constant since 2005. The trust res had been substantially impaired by the litigation costs arising from the trustees' continuing defense of the trust against the beneficiaries' challenges. In removing the trustees, the probate court concluded: "[W]ithout reference to 'fault,' the end result of the trustee-beneficiary relationship is not merely hostility but a deleterious assessment of trust funds for legal fees, which have now extended over a period of some eight years. [¶] Accordingly, this Court, while recognizing the gravity of Janice Day to appoint the trustees she deemed proper to supervise the trust, [citation] finds that when measured against the litigation costs depleting the trust, it is in the long term benefit to the administration of the trust, i.e., its

15

financial survival that the Court exercise its discretion to remove the current trustees in favor of a trustee selected by the Court."

## F.  Removal Of The Trustees From All Trusts

On January 30, 2013, the probate court appointed Mr. Ruttenberg as temporary trustee for the trust.  On February 19, 2013, plaintiff filed a brief contending the trustees should be removed from all the trusts based on the statement of decision's language and the probate court's equitable power.  On February 20, 2013, the probate issued its ruling on plaintiff's request to remove the trustees from all of the trusts.  The probate court ruled:  the issue had never been raised at trial; none of the beneficiaries wanted the current trustees; and the trust had designated successor trustees as trustees of all the trusts.  The probate court found it was within its discretion and the trust's continuance to remove the trustees from all the trusts.

On March 1, 2013, the trustees filed their reconsideration motion.  On March 12, 2013, the probate court issued its judgment, removing the trustees from all trusts.  The judgment declined to impose a surcharge on the trustees.  The trust was charged with reasonable attorney's fees incurred by the trustees in the litigation.

On March 27, 2013, defendant filed motions to set aside and vacate the judgment and for a new trial.  On May 9, 2013, Judge Biderman issued an order denying the motions.  On May 10, 2013, defendant appealed from the probate court's March 12, 2013 judgment.

## III.  DISCUSSION

### A.  Removing the Trustees

Section 15642, subdivision (b)(3) provides:  "The grounds for removal of a trustee by the court include the following:  [¶] . . . [¶] (3)  Where hostility or lack of cooperation

16

among cotrustees impairs the administration of the trust." The removal of a trustee is a matter entrusted to the sound discretion of the trial court. (*Estate of Gilmaker* (1962) 57 Cal.2d 627, 633; *Tevis v. Butler* (1894) 103 Cal. 249, 250-251.) A probate court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand. (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 85; see *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1493; *Doe 2 v. Superior Court* (2005) 132 Cal.App.4th 1504, 1517.)

The parties do not dispute hostility existed between the beneficiaries, including plaintiff, and the trustees. The probate court reasoned that the high cost of litigation was depleting the trust assets. The probate court found the litigation cost was impairing the trust's administration. Courts should also be cautious in removing a trustee appointed by the trustor. (See *Estate of Bixby* (1961) 55 Cal.2d 819, 826 ["[T]he court will not ordinarily remove a trustee appointed by the creator of the trust."]; *Estate of Gilliland* (1977) 73 Cal.App.3d 515, 528 ["When the settlor of a trust has named a trustee, fully aware of possible conflicts inherent in his appointment, only rarely will the court remove that trustee, and it will never remove him for potential conflict of interest but only for demonstrated abuse of power detrimental to the trust"].)

In *Estate of Gilmaker*, our Supreme Court was presented with a factual scenario in which hostility did impair a trust's administration. Our Supreme Court noted regarding the relationship between the trustee and beneficiary: "The hostility between the trustee and petitioner has been constant and intense. There has been disagreement over the investment of the surplus cash; over who should collect the rents from the real property; and over the kind of insurance to carry on the property. . . . [¶] The proper administration of the trust requires that there be no hostility between the trustee and the beneficiary-consultant. . . . Petitioner is not only appointed a consultant under the trust, he is also the sole life beneficiary; he owns an undivided one-half interest in property the other half of which is in the trust, and he had experience managing the entire property before the death of his father. In these circumstances the task of the consultant is to advise, not simply passively to concur or veto. The trustee does not have, as the

17

instructions of the trial court stated, the 'sole power to propose the investment and re-investment of trust funds.' A close working relationship is called for between the trustee and the consultant. Furthermore, the organization of the staff of the trustee is not conducive to reestablishing a relationship free from the existing hostility. Trust decisions are made by the trustee's trust committee. The trust committee does not meet with outsiders. Thus messages between the trustee and the consultant must pass through a trust officer, who himself has no power to make decisions. This conduit mechanism has magnified existing difficulties and is not likely to improve them." (*Estate of Gilmaker*, *supra*, 57 Cal.2d at pp. 632-633.) Our case does not involve the facts present in *Gilmaker*.

Here, there is no evidence that the hostility between the plaintiff and defendant actually impaired defendant from performing his trustee duties. The evidence submitted indicated defendant's duties were to disburse funds to beneficiaries, oversee investments and provide accountings. There was no evidence defendant failed to comply with these duties despite the hostility. Defendant testified he distributed checks and accountings to plaintiff. The probate court expressly found no fault by defendant regarding allegations of improper investments, commingling of funds or excessive trustee's fees. The trustee's duties did not require he work closely with the beneficiaries such that the hostility between them would impede the trust's administration.

The probate court reasoned that litigation would continue between the trustees and beneficiaries which would further deplete the trust's assets. However, the litigation was initiated by the beneficiaries. In 2006, Holly, Kip and Ms. Rumph initiated litigation which resulted in a settlement The litigation in this case was commenced by plaintiff, which resulted in the trustees' removal. The probate court found the trustees not at fault as to all of plaintiff's claims. Further, the probate court ruled the trustees were to draw from the trust's assets to pay for their legal representation in this litigation. The trust language permitted the trustees to use trust assets as an administration cost to resist attack or challenge. This is a peculiar situation by which a trustee who was in compliance with his trust duties was removed because he lawfully used trust assets for his legal

18

representation. As our colleagues in the Fourth Appellate District held, "It would be a poor rule indeed that would permit a beneficiary to remove a trustee for hostility it itself engendered by demanding the trustee's resignation." (*IFS Industries, Inc. v. Stephens* (1984) 159 Cal.App.3d 740, 754.)

The sole ground for removing defendant was his conduct in connection with the trust. As we have concluded, he engaged in no conduct which would require his removal as the trust's trustee. Thus, there was no ground to remove him as the trustee of any subtrust. And, as a result, the probate court did not possess the legal discretion to remove defendant as the trustee on any subtrust. We need not address defendant's contention that the probate court exceeded its jurisdiction by removing him as trustee from all the trusts.

## B. The Probate Court Did Not Abuse Its Discretion By Refusing To Apply The No-Contest Clause To Plaintiff

Defendant argues plaintiff should be disinherited for violation of the no-contest clause. Because the trust was effective in 1993, the no-contest clause will apply only if the beneficiary's challenge was frivolous. (*Estate of Ferber* (1998) 66 Cal.App.4th 244, 253; see *Fazzi v. Klein* (2010) 190 Cal.App.4th 1280, 1289 [same]; *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1213-1214.) Here, the probate court concluded plaintiff's claims were not frivolous. Plaintiff argued that the trustees: improvidently invested trust assets; took excessive trustee fees; and violated Judge Karlan's attorney's fees cap. We conduct de novo review of the probate court's ruling. (*Townsend v. Townsend* (2009) 171 Cal.App.4th 389, 398; *Meyer v. Meyer* (2008) 162 Cal.App.4th 983, 990.) Mr. Wolf's testimony supported plaintiff's position in connection with the excessive fee and improvident investment arguments. And there was sufficient ambiguity to Judge Karlan's August 8, 2008 order, that it was not frivolous to argue excessive fees were incurred. The probate court correctly refused to disinherit plaintiff.

19

## C. Plaintiff Lacks Standing To Argue Defendant Improperly Increased His Fees And, In Any Event, Her Arguments Are Meritless

Plaintiff in her cross-appeal contends that defendant violated section 15686, subdivision (b) which provides: "A trustee may not charge an increased trustee's fee for administration of a particular trust unless the trustee first gives at least 60 days' written notice of that increased fee to all of the following persons: [¶] (1) Each beneficiary who is entitled to an account under Section 16062. [¶] (2) Each beneficiary who was given the last preceding account. [¶] (3) Each beneficiary who has made a written request to the trustee for notice of an increased trustee's fee and has given an address for receiving notice by mail." Plaintiff contends that in 2008 defendant took more than $102,000 in trustees' fees. Plaintiff argues defendant should be surcharged for this trust breach.

Plaintiff's contentions have no merit. First, plaintiff has no standing to litigate the notice issue: she was a contingent remainder beneficiary of the survivor's trust; neither income nor principal were being distributed to her from that trust; and she had not requested notice. (§ 15686, subd. (b)(1) & (3); *Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.) Second, the notice required by section 15686, subdivision (b) expressly refers to the beneficiary who in this case was Ms. Rumph. Putting aside the standing issue, notice was given to Ms. Rumph and thus no basis exists for a surcharge. Third, plaintiff reviewed the accountings given to Ms. Rumph which described the trustees' fee allocations. Fourth, the probate court concluded the trustees did not increase their fees because they were permitted to receive $102,000 annually. The probate court found the trustees' retroactive payment did no damage to the trust. Fifth, the probate court reasonably could have concluded there was no damage to the survivor's trust and thereby refused to impose a surcharge. (§ 9601, subd. (a); *Estate of Kampen* (2011) 201 Cal.App.4th 971, 988.) Sixth, even if there was a violation, the probate court was not obligated to impose a surcharge. (§ 9601, subd. (b); *Estate of Kampen*, *supra,* 201 Cal.App.4th at p. 988.) Given the probate court's findings, no abuse of discretion occurred. We need not address defendant's other extensive contentions.

## IV.  DISPOSITION

The orders removing defendant, Terry Mayo, as trustee from all or any of the Day Family trusts are reversed.  The orders under review are affirmed in all other respects. Defendant is awarded his costs on appeal from plaintiff, Pamela Estelle Rumph.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*]  Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21