Filed 11/23/15  Yianilos v. Hunter CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KAREN KERRY YIANILOS, as Cotrustee etc.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CHRISTINE HUNTER et al.,<br><br>Defendants and Respondents. | D066333<br><br><br>(Super. Ct. No. P174593) |


APPEAL from orders of the Superior Court of San Diego County, Julia Craig

Kelety, Judge.  Affirmed.


Goodwin, Brown, Gross & Lovelace and Craig Gross for Plaintiff and Appellant.

Law Office of Herb Fox, Herb Fox; Hughes & Pizzuto and Laurie E. Barber for

Defendants and Respondents Christine Hunter, Nicholas Hunter and Alexandra Moran.

Richard E. Showen for Defendant and Respondent Becky Yianilos.

Karen Kerry Yianilos (Kerry),[1] a former cotrustee and a beneficiary of her late parents' trust, appeals from orders of the probate court surcharging her for certain costs unnecessarily incurred by the trust due to Kerry's breach of fiduciary duty as cotrustee. The surcharges were ordered following a trial on objections filed by trust beneficiaries (Objectors) to accountings filed by Kerry. Specifically, Kerry contends the probate court erred in imposing the following surcharges against her: (1) approximately $200,000 resulting from the cotrustees' delay in selling the trust's main asset, residential real property; (2) $97,214.30 for attorney fees incurred by Objectors; and (3) $20,000 for attorney fees paid from the trust to one of Kerry's attorneys.

We conclude that Kerry's arguments are without merit, and we accordingly affirm the probate court's orders.

I

FACTUAL AND PROCEDURAL BACKGROUND

Spero and Theresa Yianilos were trustors of the Spero and Theresa Yianilos Family Trust (the Trust). After Spero died, the Trust, by its terms, split into three separate subtrusts (A, B and C) and Theresa became the surviving trustor. A third amendment to the Trust, made in 2007, appointed Theresa's two daughters, Becky Yianilos (Becky) and Kerry, as successor cotrustees upon Theresa's death. The Trust identifies as beneficiaries Kerry, Becky, Kerry's daughter Laurel, and Becky's children

_____

[1] The evidence at trial was that appellant is known by the name "Kerry," and we will accordingly refer to her as such. Further, to avoid confusion when referring to family members, we will use first names, and intend no disrespect by doing so.

Christine Hunter, Alexandra Moran,[2] and Nicholas Hunter.[3]  As a terminating trust, the Trust provides that upon the death of the surviving trustor, the Trust's assets are to be distributed "[a]s soon as practical," and the trustee is instructed "to obtain the fair market value of the assets."

Theresa died on March 24, 2008, and Becky and Kerry accepted their appointment as successor cotrustees.  At Theresa's death, the Trust had approximately $90,000 in cash and owned real property in La Jolla (the Property), which had been Theresa and Spero's home for many years.  The home on the Property had been built by noted architect Cliff May, and sat on a large parcel of land, comprised of several different legal lots.  However, due to several years of deferred maintenance, the house was in disrepair and was also cluttered with an accumulation of personal property, which was to pass to family members under the terms of Theresa's will.

Becky and Kerry started the process of cleaning out the house, and Kerry consulted with a real estate broker in October 2008, about possibly listing the Property for sale.  However, Becky and Kerry were not able to cooperate as cotrustees, and the process of cleaning out the house and listing the Property for sale did not significantly progress after the initial effort.

---

[2]    The Trust documents refer to Alexandra by the surname Hunter, but the record reflects that Alexandra's current surname is Moran.

[3]    In respects not relevant here, the percentage interests of the beneficiaries varied between the three different subtrusts.

Although Kerry received estimates from cleaning services in early 2009 indicating that it would cost approximately $3,500 to clear out the house, she elected not to spend the Trust's money on hiring such a service. Instead, Kerry took control of the Trust's finances, depleting all of the Trust's cash on various expenditures that she failed to adequately document, including paying her housekeeper, her daughter and others for cleaning work at the Property. According to Kerry, the Trust's cash was depleted by the fall of 2009. Despite these expenditures, the house was not completely cleared of personal property until 2013 and was still in disarray at least two years after Theresa's death.

The initial attorney representing the cotrustees filed an estate tax return with the Internal Revenue Service (IRS) in June 2009, which indicated that the estate owed $138,962.99 in estate taxes. Given the Trust's limited cash, the Trust paid only $38,962.99 of the estate taxes and began to accrue penalties on the unpaid balance. Property taxes also came due, but were not paid, giving rise to the accrual of penalties. As early as 2008, the cotrustees were advised by their attorney that they should obtain a loan for the Trust so that taxes could be paid, but they did not do so until 2011.

Kerry purported to use some of her own money for the Trust's expenses after the Trust's cash was depleted. She also conducted numerous undocumented transactions for the Trust in cash, without adequate receipts, totaling as much as $50,000. Instead of properly utilizing the Trust's bank accounts, Kerry often ran transactions through her own bank accounts or through the client trust fund account that she maintained as a practicing

4

attorney, or deposited her clients' payments into the Trust's bank accounts to fund Trust expenditures.

One of the Trust's beneficiaries, Christine, spoke with Kerry in July 2009 to request an accounting and to inquire about when the Property was going to be sold. As Christine described the encounter, Kerry was verbally and physically aggressive, refused to provide an accounting, and stated that the Property would not be listed for sale.

Instead of promptly preparing to list the Property for sale, Kerry allowed her daughter, Laurel, to live on the Property without paying rent from October 2009 to September 2011, over the objection of Becky. In addition to providing free housing to Laurel, Kerry made payments from the Trust to Laurel of at least $5,000 for Laurel's work at the Property to clean it up.

Faced with actions by Kerry that she did not agree with, Becky hired her own attorney in the summer of 2009 and started threatening to seek relief in court. Within days of being retained, Becky's attorney determined that the cotrustees should have taken advantage of a fractional interest discount that would have resulted in no estate taxes being owed, instead of $138,962.99, and advised that an amended estate tax return be filed to seek a refund from the IRS. Becky was in favor of filing an amended return, but Kerry opposed the idea, and the cotrustees accordingly did not end up filing an amended

5

return.[4]  Further, according to Becky and her attorney, although they believed that the Property should be sold, Kerry was not willing to list the Property.

In approximately March 2011, the IRS began to take steps to collect the unpaid estate tax liability and indicated that it intended to levy upon the Property.  For several months, Becky and her attorney were not informed by Kerry about the IRS activity.  Eventually, when it became clear to everyone that something had to be done regarding the IRS, Becky's attorney negotiated a reprieve from the IRS, and Kerry and Becky began looking for a loan to pay the delinquent estate taxes.  Kerry then unilaterally obtained a $395,000 loan from a private lender on behalf of the Trust in May 2011, not informing Becky until after the fact, and then hiding the location of the funds from Becky by placing them in her client trust fund account.  Of the loan proceeds, $100,000 was held back by the title company to be applied toward the payment of the delinquent property taxes.  However, for reasons that were not fully explained at trial, Kerry did not obtain release of the $100,000 from the title company to pay the property taxes during her tenure as cotrustee.[5]

---

[4]    Eventually, when a successor trustee took over, an amended estate tax return was filed taking advantage of the fractional interest discount, and the IRS refunded the estate taxes and penalties that had been paid by the Trust.

[5]    The successor trustee appointed by the probate court eventually obtained release of the $100,000 to pay some of the property taxes.  In addition, by the time the successor trustee took over the administration of the Trust, the $395,000 loan was in default because Kerry had once again depleted the Trust's cash and could not make the loan payments.

In June 2011, the cotrustees finally listed the Property for sale. The Property had been appraised at a value of $3.6 million in 2008, but the 2011 listing was set at a price range of $6.2 to $6.7 million. The real estate brokers handling the listing testified that they thought the price was too high, but Kerry wanted the Property listed at that price. When no offers were received after a few months, the realtors recommended dropping the price and Becky concurred, but Kerry was opposed. The listing price stayed as originally set. No offers were made for purchase of the Property while Becky and Kerry were cotrustees.

In August 2011, Christine filed a petition to remove or suspend the cotrustees, appoint a temporary trustee, order an accounting and award attorney fees. Nicholas and Alexandra filed supporting declarations. The petition alleged, among other things, that because of "ongoing bickering, fighting and disagreement among the Co-trustees no meaningful administration leading to the distribution of this Estate has occurred for over 3 years." At a January 23, 2012 hearing on the petition for removal, the probate court suspended the cotrustees, and on February 6, 2012, it appointed a private fiduciary, Diane Peters, as successor trustee.[6] A written order that formally suspended the cotrustees' powers was entered on March 27, 2012.

---

[6] As there was still personal property devised to Becky and Kerry that had not been cleared out of the Property several months after the successor trustee took over, the probate court ordered on October 15, 2012, that Becky and Kerry remove all the personal property by November 19, 2012, and that they coordinate access to the Property with the successor trustee.

When the successor trustee took over administration of the Trust in March 2012, she lowered the listing price of the Property to $4.4 million and received an offer within 30 days. Although that buyer did not end up closing the sale, the successor trustee received two more offers, and the Property was eventually sold in May 2013 for $3.5 million.

After an order from the probate court on September 27, 2011, requiring Kerry to file an accounting covering the period of Theresa's death through the end of 2010, Kerry filed an accounting on January 23, 2012, and a petition for an order settling and approving the account (the First Account) (Prob. Code, §§ 1060-1064, 16063, 17200, subd. (b)(5)).[7] In February 2012, Kerry filed an accounting for 2011 (the Second Account), and in May 2012 filed an accounting for the period January 1, 2012, to March 29, 2012 (the Third Account), along with petitions for orders approving them.

On July 26, 2012, the Objectors (i.e., Christine, Nicholas and Alexandra) filed objections to the First Account, Second Account and Third Account (the Objections). Among the many issues raised, the Objectors alleged that Kerry had comingled Trust assets with her personal or client funds and paid out Trust funds in cash without proper documentation, that property taxes had not been paid, even after Kerry obtained a loan to pay them, and that Kerry failed to file an amended estate tax return to receive a refund from the IRS and instead paid estate taxes that were not owed. The Objectors sought an

___

[7] Unless otherwise indicated, all further statutory references are to the Probate Code.

8

order (1) denying approval of the petitions to approve the accounts; (2) denying or reducing any trustee fees claimed by the cotrustees; (3) surcharging the cotrustees for various "unnecessary costs" incurred by the Trust; and (4) awarding attorney fees that Objectors incurred in connection with the Objections.

The probate court held a nine-day trial on the Objections over a 10-month period between May 2013 and March 2014. After orally issuing its ruling on the last day of trial and considering a subsequent ex parte application by Kerry to "clarify and/or modify" the ruling, the probate court issued three written orders on May 9, 2014, as to each of the three accounts.

Among other things, the probate court denied approval of the accounts, ordered the cotrustees surcharged for certain costs incurred by the Trust, and ordered the cotrustees surcharged for the attorney fees and expert fees incurred by the Objectors.[8]

Each of the three orders contained the same prefatory finding that the cotrustees breached their fiduciary duties to the Trust's beneficiaries. [9]

As relevant here, the probate court found:

"1.     Co-trustees [Becky] and [Kerry] breached their fiduciary duties owned to the Trust beneficiaries because they failed to properly administer the Trust to the serious detriment of all the beneficiaries. They failed to act

---

[8]     Ruling on a petition filed by Becky, the probate court also issued an order authorizing a payment of trustee fees of $5,000 to Becky and $25,000 to her attorney for fees incurred. Kerry was awarded trustee fees of $15,000.

[9]     A slight and immaterial difference in wording appears in the order ruling on the First Account, which we do not reflect here. The quoted language appears exactly as stated in the order on the Second Account and Third Account.

9

in a reasonably prompt fashion to liquidate the real property and distribute the Trust assets. They failed to work together . . . . Both Trustees failed to avoid conflicts of interest and self-dealing; and failed to allocate between the sub-trusts.

"2.  [Kerry] breached her fiduciary duty by co-mingling her personal accounts with trust accounts and her attorney-client trust account; failed to properly manage the Trust's liquidity; and improperly accounted for transfers between her personal and Trust accounts.

"3.  [Kerry] failed to maintain appropriate and complete Trust records.

"4.  The Co-trustees' breaches of fiduciary duty caused damages to the Trust beneficiaries."

In the three orders, Kerry was surcharged a total of $388,177.11. Becky was surcharged a total of $242,423.02.

No party requested a statement of decision (Code Civ. Proc., §§ 632, 634), and the probate court did not issue one.

II

DISCUSSION

A.  *Kerry's Challenges to the Surcharges for Unnecessary Costs Incurred by the Trust Because of the Delay in the Sale of the Property*

Kerry's first series of arguments pertain to the probate court's orders surcharging her for certain costs that the Trust incurred because the cotrustees unreasonably delayed the sale of the Property. Specifically, the probate court found that the Property should have been sold by July 2009, and based on that finding determined that Kerry was responsible for unnecessary costs incurred by the Trust in a total amount of $193,151.84 after that date. The main components of the unnecessary costs consisted of (1) property taxes incurred after July 2009, including penalties incurred for nonpayment of those

10

property taxes; (2) the expenses associated with obtaining the $395,000 loan in May 2011; and (3) miscellaneous expenses related to maintaining the Property after July 2009, such as gardeners and utilities.

1. *The Objections Sufficiently Set Forth a Claim for Surcharges Based on the Delay in Selling the Property*

Kerry first argues that the probate court improperly ordered that she be surcharged for costs incurred by the Trust due to the delay in selling the Property because Objectors purportedly did not raise that issue in the Objections. As a legal basis for this argument, Kerry relies on the general principle that " '[t]he complaint in a civil action serves . . . to frame and limit the issues . . . and to apprise the defendant of the basis upon which the plaintiff is seeking recovery' " (*Centex Homes v. Superior Court* (2013) 214 Cal.App.4th 1090, 1102), and cites case law stating that *evidence* is properly excluded when it pertains to issues not raised by the pleadings. (*Willis v. Bank of America* (1973) 33 Cal.App.3d 745, 751; *Schweitzer v. Westminster Investments, Inc.* (2007) 157 Cal.App.4th 1195, 1214.)[10] As we will explain, we conclude that Kerry's argument is without merit.

As an initial matter, we reject the basic premise of Kerry's argument, namely that the Objections failed to allege that the Trust unnecessarily incurred costs due to the cotrustees' delay in selling the Property. Indeed, the Objections allege, "the Trust has been stymied for over four years without any forward progress. Ms. Yianilos has cost the

---

[10] Significantly, although Kerry primarily cites case law concerning *the exclusion of evidence* that pertains to issues outside the scope of the pleadings, Kerry does not argue on appeal that any evidence should have been excluded as being outside the scope of the pleadings.

Trust estate substantial losses due to her failure to properly administer the Trust. Specifically, the Trust has . . . lost revenue because the Co-trustees failed to list the properties for sale in a reasonable amount of time. Objectors are aware of several reasonable offers to purchase the Trust properties that were not considered by Ms. Yianilos despite the beneficiaries' request to sell immediately, despite the need to sell immediately because of the looming tax liabilities, and despite the lack of funds to hold on to the property without any rental income. . . . Ms. Yianilos'[s] actions have caused unnecessary costs to be incurred by the Trust . . . ." (Capitalization omitted.) Although the prayer for relief in the Objections lists requested surcharges against Kerry for several specific items and does not specifically identify the costs incurred as a result of the delay in selling the Property, the prayer for relief also requests "such further orders or relief the Court deems appropriate."

"In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) Further, the Probate Code gives the court broad authority to "make any orders and take any other actions necessary or proper to dispose of the matters presented." (§ 17206.) Applying these general principles, we conclude that the allegations in the Objections that the Trust unnecessarily incurred costs based on the cotrustees' delay in selling the Property, along with the broadly stated prayer for relief, adequately pleads a claim for a surcharge against Kerry for the costs incurred by the Trust because of the delay in selling the Property.

12

Moreover, even had the Objections lacked a specific allegation seeking a surcharge against Kerry for the unnecessary costs incurred by the Trust due to the cotrustees' delay in selling the Property, a surcharge would still be proper because the issue was fully and fairly litigated during trial. " 'It has long been settled law that where (1) a case is tried on the merits, (2) the issues are thoroughly explored during the course of the trial and (3) the theory of the trial is well known to court and counsel, the fact that the issues were not pleaded does not preclude an adjudication of such litigated issues and a review thereof on appeal.' " (*Frank Pisano & Associates v. Taggart* (1972) 29 Cal.App.3d 1, 16.) "[V]ariance between pleadings and proof is not a basis for reversal unless it prejudicially misleads a party. A variance must be disregarded if the issues on which the decision is actually based were fully and fairly tried." (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143-144.)

Here, the evidence and argument during trial covered, at length, the costs to the Trust caused by the cotrustees' delay in selling the Property. Among other things, after numerous percipient witnesses testified about the delays in listing the Property for sale and the costs to the Trust associated with the delay, Objectors' expert witness, Vickie Wolf, presented a comprehensive analysis of the monetary damage to the Trust due to the delay in selling the Property. Counsel for Kerry made no objection to any of that testimony on the basis that it related to issues outside the scope of the pleadings. Further, the parties' closing arguments discussed at length whether the cotrustees should be surcharged for the various costs that were associated with the delay in selling the Property. Counsel for Kerry argued in closing that the surcharges should not be imposed

13

because they were speculative and because the Objectors had not established causation, but he did not argue that the issue was not raised in the Objections.[11] " 'A party cannot permit an issue to be litigated and on appeal escape the consequences by claiming that such issue was not pleaded.' " (*Collison v. Thomas* (1961) 55 Cal.2d 490, 498.)

We accordingly conclude that there was no error in assessing surcharge damages against Kerry for the delay in selling the Property as that issue was presented in the Objections and was also fully and fairly litigated at trial without any meaningful objection by Kerry.

> 2. *Substantial Evidence Supports a Finding That the Property Should Have Been Sold by July 2009*

As we have explained, the probate court based the surcharges against Kerry on its finding, made orally at the end of the trial, that the Property should have been sold by July 2009. Kerry challenges this finding, arguing that the evidence does not establish that the Property could have been sold by July 2009, so that the surcharge based on that finding was impermissibly speculative. As we will explain, we disagree.

---

[11]    We note that in November 2013, after three days of trial had taken place, Kerry filed a supplemental trial brief with a topic heading stating, "Objectors' efforts at trial to claim additional surcharge damages from a delay in listing should fail as it was never claimed, lacks requisite causation, and is speculative." (Capitalization omitted.) Although Kerry argues that this constitutes a substantive objection to the imposition of a surcharge for delay in selling the Property on the ground that the issue was not presented in the Objections, we do not view this topic heading as raising a substantive argument. Specifically, although the topic heading states the surcharge associated with a delay in listing the Property "was never claimed," that statement is not explained or substantiated in any following discussion after the topic heading and was never mentioned at trial.

As relevant here, "case law establishes that a court may not surcharge a fiduciary without substantial evidence that the particular loss was caused by the fiduciary's fault." (*Borissoff v. Taylor & Faust* (2004) 33 Cal.4th 523, 531.) Further, " '[i]t is fundamental that "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." ' " (*In re Estate of Kampen* (2011) 201 Cal.App.4th 971, 991.) We apply a substantial evidence standard of review in determining whether the findings underlying an award of damages is supported by the record. (*Id.* at p. 992.) We accordingly turn to the evidence in the record that supported a finding the Property could have been sold by July 2009.

Theresa died on March 24, 2008, and there was evidence at trial that days later, on April 3, 2008, Kerry was sent a letter from William Warren, a wealthy individual who was interested in possibly buying the Property. Kerry ignored Warren's letter, and Warren followed up by trying to make contact through a third party, but Kerry rudely rejected the inquiries. Other witnesses testified that Kerry was aware of Warren's interest but did not want to consider him as a buyer. Warren testified at trial that he would have been very interested to engage in a negotiation for the Property if the sale price was between $3.6 and $3.8 million, and he would have paid cash for any eventual purchase. Although, as the probate court recognized, Warren may not have ended up being the ultimate buyer, the record supports a reasonable inference that willing buyers existed in the 2008 and 2009 timeframe had the Property been listed for sale.

Further, the evidence supports a reasonable inference that the cluttered and neglected state of the Property would not have been an impediment to promptly listing it

15

for sale had the cotrustees sought to do so. According to Kerry's own testimony, she received offers from cleaning services to prepare the Property for sale for approximately $3,500. Further, according to the real estate broker that Kerry initially consulted in 2008, only a few cosmetic repairs were recommended to prepare the Property for sale (repairs to the floors and walls, and repainting), which he estimated would have cost approximately $50,000, as any potential buyer would likely be planning to undertake a complete remodel of the house.

Kerry argues that the Property was difficult to sell, pointing to evidence that (1) there were no offers on the Property while the cotrustees had it listed between June 2011 and March 27, 2012, when the successor trustee took over; (2) the Property was unique in that the house was potentially entitled to a historical designation, which would have made the Property more difficult to develop; and (3) 2008 to 2012 was a slow period in the local real estate market. However, as a real estate broker testified at trial, the lack of offers during the cotrustees' administration of the Trust was attributable to the unreasonably high price at which Kerry insisted the Property be listed, not the slow real estate market. After the successor trustee lowered the listing price for the Property, an offer was received in less than 30 days. This evidence supports a reasonable inference that the cotrustees could have sold the Property much earlier had they listed it at a reasonable and realistic price, despite any slowdown in the real estate market during the relevant time period or any unique features of the Property that may have discouraged certain buyers.

16

In addition, the evidence shows that it took the successor trustee a total of 14 months to close the sale on the Property. Applying that same 14-month timeframe in deciding whether the cotrustees could have reasonably sold the Property by July 2009, we note that Theresa died 16 months prior to July 2009, which would have given the cotrustees two months to prepare the Property for sale and 14 months to find a buyer. Based on that evidence, the probate court could reasonably find that the Property should have been sold by July 2009.

In sum, we conclude that substantial evidence in the record supports the probate court's finding that the Property should have been sold by July 2009, and the probate court therefore properly calculated the surcharge against Kerry based on costs incurred by the Trust after July 2009.[12]

---

[12] Kerry also argues that substantial evidence does not support a finding that she caused the Trust to incur any costs after she was removed as cotrustee, and accordingly we should reduce the surcharge against her to include only those costs incurred by the Trust until the time that the successor trustee took over in March 2012. Specifically, Kerry was surcharged for certain property tax liability and loan interest charges incurred after the successor trustee took over. Kerry's argument lacks merit. As a matter of logic, if — as the probate court found — the cotrustees' breach of duty caused the Property to remain unsold at the time the successor trustee took over, the ramifications of that breach would not have immediately ceased when the cotrustees were removed. Instead, the negative impacts caused by the cotrustees' failure to sell the Property continued *until the Property was sold* because the Property would continue to incur property taxes and loan interest liability. All of the evidence shows that the successor trustee took prompt and reasonable steps to sell the Property as soon as possible to mitigate the costs that continued to accrue due to the cotrustees' failure to sell the Property. Accordingly, substantial evidence supports a finding that *all* of the expenses attributable to the delay in selling the Property, even *after* the successor trustee took over, were proximately caused by the cotrustees' breach of their fiduciary duty to the Trust's beneficiaries, not by the successor trustee.

17

3.    *The Trust Provisions Conferring Discretion to Hold Property and Delay Distributions Do Not Bar the Surcharges Against Kerry for Unnecessary Expenses Caused by the Delay in Selling the Property*

Kerry contends that the probate court erred in finding that she breached her fiduciary duty by failing to sell the Property by July 2009 because Trust provisions purportedly gave the cotrustees absolute discretion to decide when to sell Trust assets. For her argument, Kerry relies on three provisions of the Trust.

First, under the heading "Trustee's Discretion," section 6.12 of the Trust states: "All discretions granted to or vested in the Trustee by any provision of this instrument are to be exercised in the sole and absolute discretion of the Trustee."

Second, under the heading "Retention of Assets," section 6.03 of the Trust states: "The Trustee is expressly authorized to hold and retain any securities, properties, or other investments, . . . and continue to hold, manage, and operate any property . . . received or acquired at any time hereunder, as long as in its discretion it elects to do so, the profits or losses therefrom, if any, to inure to or be chargeable against the Trust Estate and not the Trustee."

Third, under the heading "Timing of Distributions," section 7.12 of the Trust provides:  "(a) The Trustee hereof may delay the division of the Trust Estate and/or the distribution of Trust assets therefrom for a period of up to six months following the death of any Trustor.  Said delay . . . may occur . . . if it is contemplated that the alternate valuation date may be selected in connection with the filing of any United States Estate Tax Return.  [¶]  (b) Notwithstanding any other provisions hereof, the Trustee may delay the distribution of Trust assets herefrom for up to one year following the date that said

18

distribution would otherwise be made.  Said delay shall occur, if in the Trustee's sole

discretion, unnecessary expenses would be incurred in connection with sale of Trust

assets at that time, if said distribution would create unnecessary expenses for the Trust

that could otherwise be avoided by the delay, and/or a loss in principle value may be

suffered with regard to one or more trust assets to accomplish the distribution."

Based on these provisions, Kerry contends that "the co-trustees were given

absolute discretion as to the method and timing for sale of property of the Trust and in

regard to the timing of distribution following the settlor's death," so that the probate court

erred in concluding that Kerry breached her fiduciary duty by not selling the Property by

July 2009.  As we will explain, we reject Kerry's argument.

As an initial matter, we note that Kerry's claim that she was afforded absolute

discretion by section 6.12 of the Trust is necessarily limited by a statutory provision

stating that even when a trustee is afforded absolute discretion, the trustee must

nevertheless avoid bad faith and act in accordance with fiduciary principles.  Specifically,

section 16081 states that "if a trust instrument confers 'absolute,' ' sole,' or 'uncontrolled'

discretion on a trustee, the trustee shall act in accordance with fiduciary principles and

shall not act in bad faith or in disregard of the purposes of the trust."  (§ 16081, subd. (a).)

Thus, "even a trustee with 'absolute discretion' may not 'neglect its trust or abdicate its

judgment,' . . . or show a 'reckless indifference' to the interests of the beneficiary."

(*Estate of Collins* (1977) 72 Cal.App.3d 663, 672, citation omitted.)  Therefore, to the

extent that the record supports a finding that Kerry acted in bad faith or in disregard of

the purposes of the trust or the interests of the beneficiaries, she may be found to have

19

acted improperly despite the Trust's conferral of sole and absolute discretion on the cotrustees in certain instances.

Turning to section 6.03 of the Trust, although that provision gives the cotrustees discretion to continue to hold property, we conclude that the evidence reasonably supports a finding that Kerry did not act according to fiduciary principles and engaged in bad faith in continuing to hold the Property beyond July 2009 rather than selling it.[13] Kerry contends that she acted in good faith by delaying the sale of the Property because she wanted to wait until the real estate market improved and the Property would sell at a higher price and benefit the beneficiaries. However, that view of Kerry's conduct is not the only possible interpretation of the evidence presented at trial. Indeed, the probate court could reasonably find that instead of delaying the sale of the Property to obtain a higher price in an improved market to profit the beneficiaries, Kerry delayed selling the Property because of any of a number of unacceptable reasons, including being motivated by meanspirited intrafamily conflicts, inattention and neglect of her duties, or the desire to provide her daughter with a free residence for two years. Under that reasonable interpretation of the evidence, the probate court could properly conclude that Kerry was motivated by bad faith or disregarded the interests of the beneficiaries. Based on that implied finding, section 6.03 of the Trust does not authorize Kerry's delay in selling the

---

[13]    Although the probate court did not make an express finding that Kerry acted in bad faith, because the parties did not request a statement of decision, we apply the doctrine of implied findings and presume that the probate court made all necessary findings supported by substantial evidence. (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970 (*Acquire II*).)

20

Property and does not absolve her from liability for the costs incurred by the Trust due to the delay.

Although Kerry also relies on section 7.12 of the Trust, that provision does not advance her argument. Specifically, section 7.12 allows the Trustee to delay a distribution of assets to the beneficiaries for *up to a year* if doing so will avoid expenses or increase value. Here, however, Kerry delayed far more than a year, not even attempting to start selling the Property until more than three years after Theresa's death.

4.     *Substantial Evidence Supports the Probate Court's Decision to Surcharge Only Kerry for the Penalties on the Unpaid Property Taxes*

As a result of not selling the Property by July 2009, the Trust incurred $137,416.22 in property taxes that would not otherwise have been incurred, and due to nonpayment of those property taxes, the Trust also incurred penalties of $53,507.39. The probate court ordered that Becky and Kerry each be surcharged half of the property taxes unnecessarily incurred, but as to the penalties for nonpayment of those taxes, it ordered that *only* Kerry be surcharged, imposing a surcharge against her for the entire amount of $53,507.39. Kerry argues that the probate court erred in failing to order that Becky be surcharged for half of the penalties. According to Kerry, the probate court's order was "inconsistent with the [probate] court's determination that 'both [Kerry] and [Becky] breached their fiduciary duties . . .' and 'failed to act in a reasonably prompt fashion to liquidate the real property.' " As we will explain, we reject Kerry's argument.

Section 16402, subdivision (b) provides: "A trustee is liable to the beneficiary for a breach committed by a cotrustee . . . : (1) Where the trustee participates in a breach of

21

trust committed by the cotrustee. (2) Where the trustee improperly delegates the administration of the trust to the cotrustee. (3) Where the trustee approves, knowingly acquiesces in, or conceals a breach of trust committed by the cotrustee. (4) Where the trustee negligently enables the cotrustee to commit a breach of trust. (5) Where the trustee neglects to take reasonable steps to compel the cotrustee to redress a breach of trust in a case where the trustee knows or has information from which the trustee reasonably should have known of the breach." Applying this standard, although the probate court found that both Kerry and Becky shared fault for the delay in selling the Property as they failed to work together to get the Property listed for sale, substantial evidence supports an implied finding that Kerry's breach of fiduciary duty alone was the cause of the penalties for the nonpayment of property taxes incurred by the Trust.[14]

The evidence at trial established that Kerry took control of the Trust's finances and did not allow Becky to participate in decisions about how the Trust's funds were used and did not provide Becky with an accounting. Accordingly, there is no evidence that Becky played any part in the decision as to whether to apply the Trust's funds to pay property taxes on the Property while the Trust still had the liquidity to do so. Second, when it became apparent that the cotrustees would have to obtain a loan to pay the tax liabilities because the Property was not going to be listed for sale and the Trust's cash was depleted,

---

[14] In the absence of a statement of decision explaining the basis for the probate court's decision to surcharge Kerry alone for the amount of the property tax penalty, we imply all necessary findings supported by substantial evidence. (*Acquire II*, *supra*, 213 Cal.App.4th at p. 970.)

Becky's attorney advocated to Kerry that she obtain a loan, but Kerry refused to do so, and delayed obtaining a loan until 2011. When that loan was finally obtained, Becky was shut out by Kerry from anything having to do with the loan or the use of its proceeds. Although $100,000 of the loan was supposed to be applied to the delinquent property taxes, Kerry did not have those funds released from the title company, causing the property tax penalties to continue to increase. Accordingly, the record supports a finding that Kerry alone was responsible for the property tax penalties and was thus properly surcharged for the full amount of those penalties.

B.       *The Probate Court Properly Surcharged Kerry for the Attorney Fees and Expert Fees Incurred by the Objectors in Litigating Their Objections*

In addition to surcharging Kerry for the costs associated with the delay in the sale of the Property, the probate court surcharged Kerry in the amount of $97,214.30 for half of the attorney fees incurred by the Objectors in litigating the Objections, surcharging Becky for the other half.

The Objections include a general request that probate court award Objectors the attorney fees and costs incurred in connection with the Objections, but do not specify the legal basis for the fee request. However, in their trial brief and during closing argument, the Objectors identified section 17211, subdivision (b) as one of the grounds for requiring the cotrustees to pay the attorney fees.[15] Although not specifically referencing section

---

[15]       The Objectors also identified the common fund theory as a possible basis for an order requiring Kerry to pay their attorney fees. (See *Estate of Reade* (1948) 31 Cal.2d 669, 671-672.) As we conclude that the attorney fee award is supported by section

23

17211 when ordering the surcharge for the attorney fees, the probate court generally identified section 17211 as the basis for the surcharges that it imposed during its rulings on the Objections to the three accounts.

Section 17211, subdivision (b) provides: "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account. The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust." (See *Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1595 (*Leader*) [explaining that § 17211 is an exception to the rule that "[t]rust beneficiaries must ordinarily pay their own attorney fees in challenging the trustee's conduct, even when they are successful"].)

Based on this provision, Kerry could be surcharged for the Objectors' attorney fees if her opposition to the Objections was without reasonable cause and in bad faith. Here, because the parties did not request a statement of decision, we imply all necessary findings supported by substantial evidence in the record. (*Acquire II*, *supra*, 213 Cal.App.4th at p. 970.) The issue presented, accordingly, is whether substantial evidence

17211, we need not, and do not, discuss whether the common fund theory is applicable here.

24

in the record supports a finding that Kerry opposed the Objections without reasonable cause and in bad faith.[16]

Within the meaning of section 17211, " 'reasonable cause' . . . to oppose a contest of an account" means "an objectively reasonable belief, based on the facts then known to the trustee, either that the claims are legally or factually unfounded or that the petitioner is not entitled to the requested remedies." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 927.) " '[B]ad faith' in this context concerns the trustee's subjective state of mind . . . ." (*Id*. at p. 926, fn. 47.) "[I]n enacting section 17211, the Legislature intended to discourage frivolous litigation about a trustee's accounting . . . ." (*Chatard v. Oveross* (2009) 179 Cal.App.4th 1098, 1110.)

Here, based on the extensive evidence at trial about Kerry's poor record keeping that made it impossible to understand the specific transactions concerning the Trust; the tens of thousands of dollars in undocumented cash transactions involving Trust funds; and Kerry's comingling of Trust funds with her own funds and those of her clients, which also made it impossible to understand the relevant transactions and cash flow, the probate

---

[16] This case is distinguishable from *Leader*, *supra*, 182 Cal.App.4th 1588, upon which Kerry relies. In *Leader*, the probate court erroneously concluded that section 17211 did not apply, and it accordingly had no occasion to make a finding as to whether the trustee acted without reasonable cause and in bad faith. (*Id*. at p. 1599.) *Leader* remanded for the probate court to make findings on those issues. (*Id*. at pp. 1599-1600.) Here, in contrast, because relief was expressly sought under section 17211, and the probate court cited that provision in making the surcharge award, in the absence of a statement of decision we imply findings supporting the probate court's decision (*Acquire II*, *supra*, 213 Cal.App.4th at p. 970), namely that Kerry acted without reasonable cause and in bad faith in opposing the Objections.

25

court reasonably could conclude that Kerry had no reasonable cause to oppose the Objections to the accountings. Specifically, it is a reasonable inference from the evidence presented at trial that any objective person would know that the accountings could not be approved due to Kerry's failure to maintain proper records and properly document transactions. Further, based on evidence of Kerry's animosity and hostile attitude toward Christine as described in Christine's testimony, the probate court could reasonably find that Kerry's opposition to the petition to approve the accountings was made in a bad faith attempt to cause the Objectors to incur unnecessary attorney fees and thereby deplete the value of any eventual distribution of the Trust funds to them rather than in a good faith effort to defend the accountings that she prepared.

We accordingly conclude that substantial evidence supports an implied finding that Kerry acted without reasonable cause and in bad faith in opposing the Objections, and that she was properly surcharged for the attorney fees and expert fees incurred by the Objectors under the authority of section 17211, subdivision (b).

C.    *Kerry's Challenge to the Surcharge for the Trust's Payment of Her Attorney Is Without Merit*

The probate court surcharged Kerry for $20,000 paid from the Trust to her attorney, Susan Wilson, to defend against the petition to remove her as cotrustee. Kerry argues that "to the extent this Court sets aside the trial court's surcharge damages award against [Kerry], or any portion thereof, the surcharge for Ms. Wilson's fees should then also be set aside." Although Kerry's reasoning is not clearly expressed, she appears to contend that in the event there is merit to any of her other arguments in this appeal, we

26

must necessarily find that Wilson's fees incurred in defending the petition to remove Kerry as cotrustee are a reasonable expense of the Trust.

We reject Kerry's argument because it is contingent on her prevailing on any of her other appellate challenges to the surcharges imposed by the probate court. As we have concluded that the whole of Kerry's appeal lacks merit, we necessarily also reject her argument challenging the surcharge of $20,000 for the Trust's payment of Wilson's fees.[17]

## DISPOSITION

The probate court's orders are affirmed.

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.

[17] In their respondents' brief, Objectors state that "they are entitled to their fees and costs on appeal" and contend that we "should award such fees and costs in an amount to be determined on remand," either pursuant to section 17211 or the common fund theory. We express no view on whether respondents should be awarded their attorney fees on appeal, as that issue should be raised in the first instance in the probate court. (See *Nestande v. Watson* (2003) 111 Cal.App.4th 232, 238 ["whether a party has met the statutory requirements for an award of attorney fees is a question best decided by the trial court in the first instance"].)